# NEW ENGLAND TROUT AND SALMON CLUB, APT.,

## v.

## GEORGE MATHER.

### May Term, 1895.

*In what waters the public has the right of fishing. Boatable waters. Constitutional law.*

1. The term boatable waters as used in Ch. 2, s. 40 of the constitution of Vermont, which provides that the public shall have the right of fishing in such waters, means waters navigable in fact, that is capable from their situation and in their ordinary condition of being used by the public as a means of passage or transportation.

2. Whether a particular body of water is navigable in fact is ordinarily a question for the jury, and he who asserts that fact as the foundation for a right in the water must prove it.

3. It cannot be said as matter of law that the public has the right of fishing in a pond of seventy-five acres, not reserved in the grant of the town, as against the owners of the soil underneath and around it.

4. The legislature cannot make public waters which the constitution declares private.

5. S. 31, No. 80, Acts of 1892, providing that the crossing of uncultivated lands for the purpose of fishing shall not be actionable unless actual damage be done, is unconstitutional, for that amounts to a taking of private property for private use.

Trespass *quare clausum.* Plea, not guilty. Trial by jury at the September term, 1894, TAFT, J., presiding.

The court directed a verdict for the defendant.    The plain-. tiff excepts.

*Waterman, Martin & Hitt* and *J. K. Batchelder* for the plaintiff.

At common law the public had no right of fishing in non-tidal waters although they were navigable in fact.    *Murphy* v. *Ryan*, 2 Ir. R. C. L., 143 ; *Pearce* v. *Scotcher*, 9 L. R. Q. B. Div., 162 ; *Reece* v. *Miller*, 8 L. R. Q. B. Div., 626 ; *Allgood* v. *Gibson*, 34 L. T. Rep., 883 ; *Marsh* v. *Colby*, 39 Mich., 626 ; *Waters* v. *Lilley*, 4 Pick., 145 ; *Hooker* v. *Cummings*, 20 Johns. 90 ; *McGready* v. *Virginia*, 94 U. S. 301 ; *Holyoke Water Power Co.* v. *Lyman*, 15 Wall., 500 ; *Could* v. *James*, 5 Cow. 369 ; *Hall* v. *Hill*, 1 Wharton 124 ; *People* v. *Platt*, 17 Johns. 195 ; *Smith* v. *Miller*, 5 Mason 191.

Waters of no practical value for public purposes may be private property.    *Ledyard* v. *Ten Eyck*, 36 Barb. 102 ; *Weise* v. *Smith*, 3 Oreg. 445 ; *Morgan* v. *King*, 35 N. Y. 454 ; *Com.* v. *Hemphill*, 26 Wend 404 ; *Tomlin* v. *Dubuque, &c., R. Co.*, 32 Iowa 106 ; *The Daniel Ball*, 10 Wall. 557 ; *The Montebello*, 11 Wall. 411 ; *Veazie* v. *Dwinell*, 50 Me. 496 ; *Valt* v. *Eldrid*, 23 Wis. 410 ; *Chicago* v. *McGinn*, 51 Ill. 269 ; *Roe* v. *Granite Bridge Co.*, 21 Mass. 344 ; *Shaw* v. *Crawford*, 10 Johns. 236 ; *Lembeck* v. *Nye*, 47 Ohio St. 336 ; *Stower* v. *Rice*, 121 Ind. 51 ; *Beckmer* v. *Kreamer*, 43 Ill. 447 ; *Chute* v. *Fisher*, 65 Mich. 48.

*Haskins & Stoddard* for the defendant.

Boatable waters are those boatable in fact.    *Temple* v. *Mead*, 4 Vt. 540 ; *Benscoter* v. *Long*, 157 Pa. 208 ; *Reynolds* v. *Commonwealth*, 93 Pa. 458 ; *Curson* v. *Blazer et als.*, 2 Binney 474 ; *Tinicum Fishing Co.* v. *Coates*, 11 Smith 21.

ROWELL, J.   Marlboro South Pond is a natural body of water from ten to thirty feet deep, except around the edges, where the water is shallow, and it covers about seventy-five acres.    It has no inlet, but a small brook forms its outlet.   The town of Marlboro was a New Hampshire grant, having been chartered by Benning Wentworth in the name of the King in 1751, without reservation of any ponds or streams.

The plaintiff claimed, and its testimony tended to show, that at the time in question it was the sole owner and the exclusive possessor and occupant of a strip of land around said pond, four rods wide most of the way, and of a piece of land at the north end of several acres, and of the land covered by the water of the pond, and of the pond itself; that it purchased the property for the purpose of propagating fish there for its own use and benefit, and had thereon erected buildings and expended more than ten thousand dollars, and stocked the pond with trout; and that the premises were inclosed and posted according to law, to the knowledge of the defendant, who entered thereon on May 9, 1893, which was in the open season, and fished on divers parts of the pond, some of which were covered by particular description in some of the deeds in plaintiff's chain of title.    As the court directed a verdict for the defendant, all that the plaintiff's testimony tended to show must be taken as proved.

Our Constitution provides that "the inhabitants of this State shall have liberty in seasonable times, to hunt and fowl on the lands they hold, and on other lands not inclosed; and in like manner to fish in all boatable and other waters (not private property) under proper regulations, to be hereafter made and provided by the General Assembly." Ch. II. s. 40. The defendant claims that as this pond is boatable in fact it is boatable within the meaning of the Constitution, and that therefore he had a right to fish therein when he did, as he contends that the words, ("not private property"), qualify,

"other waters" only, and not, "boatable" waters, so that our inhabitants have liberty in seasonable times to fish in all waters boatable in fact, whether private property or not.

The plaintiff, on the other hand, contends that the words, ("not private property"), qualify "boatable" as well as "other waters;" but if not, that is not enough that waters are boatable in fact; that to be boatable under the Constitution they must be of such volume and size that they can be advantageously used by boats at certain seasons of the year for transporting the products of the surrounding country, the products of the mines, the fields, and the forests.

By the law of Rome, all rivers and ports were public; and therefore the right of fishing therein was common to all men. Justinian, Lib. 2, Tit 12.

But by the common law of England there is a public right of fishing only in navigable waters; and no waters are deemed navigable in law except tidal waters.

"The narrow sea adjoining the coast of England is part of the waste and demesnes and dominions of the King of England whether it lies within the body of any county or not. * * In this sea the King hath a double right, namely, a right of jurisdiction, which he ordinarily exerciseth by his admiral, and a right of property or ownership. * * * The right of fishing in that sea and the creeks and arms thereof is originally lodged in the crown, as the right of depasturing is originally lodged in the owner of the waste whereof he is lord, or as the right of fishing belongs to him that is owner of a private or inland river. * * * But though the King is the owner of that great waste, and as a consequence of his propriety hath a primary right of fishing in the sea and the creeks and arms thereof, yet the common people of England have regularly a liberty of fishing in the sea or the creeks and arms thereof as a public common of piscary, and may not without injury to their right be restrained of it, unless in such places, creeks, or navigable rivers where either the King or some particular subject hath gained a propriety exclusive of the common liberty." 1 Hargrave's Tracts, Part I., Chap. IV.

Non-tidal waters are not deemed navigable in law

though navigable in fact; and there is no public right of fishing therein. *Reece* v. *Miller*, L. R., 8 Q. B. 626. It is obvious that the status of navigability cannot, of itself, carry with it a public right of fishing, for the two things have no necessary connection between them. *Musset* v. *Burch*, 35 Law Times, N. S. 486. The soil under tidal waters is not owned by private individuals, whereas the soil under non-tidal waters, though navigable in fact, is thus owned in England, and on this is based the distinction between them in respect of fishing, for the right of fishing in non-tidal waters by one not the owner of the soil thereunder is not an easement but a right of profit in the land of another—*Lloyd* v. *Jones*, 6 C. B. 81 ; *Bland* v. *Lipscombe*, 4 El. & B. 714, note—which cannot exist by custom, except in the case of a copyhold tenant against his his lord, nor by dedication, but only by grant or prescription. 1 Wms. Saund. 341, n. (3) ; *Cobb* v. *Davenport*, 33 N. J. Law, 97 Am. Dec. 718.

"Fresh rivers, of what kind soever, do of common right belong to the soil adjacent, so that the owners of the one side have, of common right, the propriety of the soil, and consequently the right of fishing *usque ad filum aquæ;* and the owners of the other side the right of soil or ownership and fishing unto the *filum aquæ* on their side. And if a man be owner of the land of both sides, in common presumption he is the owner of the whole river, and hath the right of fishing according to the extent of his land in length. With this agrees the common experience. * * But special usage may alter the common presumption ; for one man may have the river and another the soil adjacent ; or one man may have the river and soil thereof and another the free or several fishing in that river." 1 Hargrave's Tracts, Part I., Chap. I.

But the distinction between tidal and non-tidal waters in respect of fishing does not distinguish them in respect of a public right of passage and transportation, for the public have such right in both, for Lord Hale says, that "as the common highways upon the land are for the common land

passage, so these kinds of rivers, whether fresh or salt, that bear boats or barges, are highways by water; and as the highways by land are called the King's highways, so these public rivers for public passage are called royal streams, not in reference to the propriety of the river, but to the public use." *De Jure Maris*, c. 2. Again he says, chapter 3 : "There be some streams or rivers that are private, not only in propriety or ownership but in use; as, little streams or rivers that are not of common passage for the king's people; and there be other rivers, as well fresh as salt, that are of common or public use for the carriage of boats and lighters, and these, whether they are fresh or salt, whether they flow and reflow or not, are, *prima facie, publici juris*, common highways for man or goods or both from one inland town to another. Thus, the rivers of Wey, of Severn, of Thames, and divers others. as well above the bridges and ports as below, as well above the flowings of the sea as below, and as well where they have come to be of private propriety as in what part they are of the King's propriety, are public rivers, *juris publici*."

Thus it appears that to determine whether a non-tidal river is public or private in use, for none of them are public in ownership, the common-law test is, whether it is boatable as a highway as distinguished from navigable in its technical and legal sense.

The law applicable to non-tidal rivers in England is also applicable to inland lakes and ponds, however large, and in them the crown has no *de jure* right of soil nor of fishery. *Bristow* v. *Cormican*, L. R. 3 App. Cas. 641.

Such was the common law of England before and at the time of the adoption of our Constitution in 1777, in which the provision in question was substantially the same as now, and was taken from the Pennsylvania constitution of 1776, in which the language was, "boatable waters and others not private property." The framers of our Constitution must be presumed to have been familiar with the common law, for the inhabitants of the State had been and were "habituated to conform their manners to the English law, and to hold their real estates by English tenures." Preamble to the act

adopting the common and statute law of England, passed in 1782, State Papers, 450.   Knowing that law, they undoubtedly regarded it inapplicable in respect of fishing to our local situation and circumstances, for under it we had no waters in which fishing was or would be free as against private ownership, for none of them were navigable, not even Lake Champlain, within the common-law meaning of that term, and that was the only meaning with which they were acquainted, for then the doctrine that waters navigable in fact are navigable in law had not been announced in this country, much less developed and generally established as now, and hence a change of the common law was necessary in order to insure a common of fishery to any extent, and therefore when they came to draft the section in question, they could not say that the inhabitants should have liberty to fish in all navigable waters, but were compelled, in order to accomplish their purpose, to employ some other word, and so they employed boatable, an apt word to express the common-law *status* of non-navigable waters public in use though private in ownership, that is, common highways.  Angell on Watercourses, 6th ed., p. 729, has the distinctive head of "The common-law distinction between rivers *boatable and navigable*, and how far the distinction has been recognized in this country."  We regard it unwarrantable to say that "boatable," as used, was intended to embrace all waters boatable in fact though private in use as well as in ownership, for the common law, with reference to which the framers are presumed to have acted, did not give such waters the *status* of boatability, but classed them by themselves as "private, not only in propriety or ownership but in use ; as, little streams or rivers that are not of common passage for the King's subjects."   *De Jure Maris*, above quoted.  We also regard it unwarrantable to say that by recombining the words of that part of the section under consideration, and placing "waters" after "other" instead of after "boatable," as it was in

the Pennsylvania constitution, the framers intended to alter the provision by making the words, (''not private property''), qualify ''boatable'' also, which they did not do in the Pennsylvania constitution, for such extended qualification would, to their minds, have nullified the provision, as, by the common law as they knew it, all the waters of the State were, or might and probably would, under governmental grants, become, private property within the meaning of those words as they used them; and by that law as we now administer it, such extended qualification would practically nullify the provision, for under it most of our waters are equally private property in ownership, though many of them are public in use.

We hold, therefore, that boatable waters, within the meaning of the Constitution, are waters that are of ''common passage'' as highways.

The rule by which to determine whether waters are of ''common passage'' as highways or not is variously stated but clearly enough defined.    The test of navigability of a river is, as stated by the Supreme Court of the United States, whether it can be used in its ordinary condition as a highway for commerce, conducted in the customary mode of trade and travel on water.    And they constitute navigable waters of the United States when they form in their ordinary condition, by themselves or by uniting with other waters, a continuous highway over which commerce is or can be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water.    *The Daniel Ball*, 10 Wall. 557.    If, however, they do not thus form such continuous highways, but are navigable only between places in the same state, they are not navigable waters of the United States, but only of the state.    *The Montello*, 11 Wall. 411.    Hence, the capability of use by the public for the purposes of transportation and commerce affords the true criterion of the navigability of a river rather than the

extent or the manner of that use.    If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be carried on, it is navigable in fact, and therefore becomes in our law a public river or highway.    *The Montello*, 20 Wall. 430.    It is not, however, as Chief Justice Shaw said in *Roe* v. *The Granite Bridge Co.* 21 Pick. 344, "every small creek in which a fishing skiff or gunning canoe can be floated at high water that is deemed navigable ; but in order to have this character it must be navigable to some purpose useful to trade or agriculture."

The Supreme Court of Maine, where timber abounds, has frequently had this question before it, and given it much consideration first and last.    In *Wadsworth* v. *Smith*, 11 Me. 278, 26 Am. Dec. 525, it is said that the general principle of the common law is, that above the flow of the tide, rivers become private, either absolutely so or subject to the public right of way, according as they are small or great ; that those that are sufficiently large to bear boats or barges or to be of public use in the transportation of property, are highways by water, over which the public have a common right ; but that such little streams and rivers as are not floatable, that is, cannot in their natural state be used for the carriage of boats, rafts, or other property, are wholly and absolutely private, not subject to the servitude of the public nor to be regarded as public highways by water, because they are not susceptible of use as a common passage for the public.    In *Brown* v. *Chadbourn*, 31 Me. 9, 50 Am. Dec. 641, a leading case on this subject, much cited in other jurisdictions, it is said that the distinguishing test between rivers that are entirely private property and those that are private property subject to public use and enjoyment, consists in whether they are susceptible or not of use as a common passage for the public ; that the true test whether a highway or not is, whether the stream is inherently and in its nature capable of being used for the

purposes of commerce, for the floating of vessels, boats, rafts, or logs; that when a stream possesses such a character, the easement attaches, leaving to the owners of the bed all other modes of use not inconsistent therewith. In *Morgan* v. *King*, 35 N. Y. 454, the true rule is said to be, that the public have a right of way in every stream that is capable in its natural state and its ordinary volume of water, of transporting in a condition fit for market, the products of the forests or the mines or the tillage of the soil upon its banks. In the recent case of *Haywood* v. *Farmers' Mining Co.*, South Carolina, 28 L. R. A. 42, the question is fully considered and the test said to be, navigable capacity, and not that the surroundings should be such that the stream may be useful for the purposes of commerce, for, it is said, the stream may not be useful for commerce at one time and yet circumstances may make it so at another time. The cases are generally to the same effect. And they all agree that it is not necessary to the right that the stream should have been used as a highway; it is enough if it is capable of such use. Nor is it necessary that it should have that capacity at all seasons of the year. It may be subject to periodical fluctuations in the volume and height of its water, attributable to natural causes and recurring with the seasons, yet if its periods of high water ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement. But the easement is not confined to business merely; it extends to pleasure as well, the same as does the easement of a highway by land. *Attorney General* v. *Woods*. 108 Mass. 436, 11 Am. Rep. 380.

As a general proposition, waters above the tide are, *prima facie*, private in use as well as ownership, and he who asserts the contrary must prove it. *Rhodes* v. *Otis*, 33 Ala. 578, 73 Am. Dec. 439; Note to *St. Louis, &c., R. R. Co.* v. *Ramsey*, 22 Am. St. Rep. 301; Angell, Watercourses, s. 535. And whether such waters are, in the given case,

inherently capable of use as a common passage for the public, is a question of fact, and he who asserts that they are must prove it, unless the court can take judicial notice that they are, as perhaps it can in some cases. This proposition is applicable to the waters in question, as they were not reserved in the original grant of the town, neither expressly nor by legal implication, and are therefore capable of being private property both in use and in ownership.

Although this pond is inherently capable of floating "a fishing skiff or a gunning canoe," no claim is made that it is inherently capable of use to any extent beneficial to trade or agriculture; and the reason may be, because it is thought that no such claim can well be made. But however that is, we cannot say as matter of law that it has not such capacity. All we can say is that as the case is presented it does not appear to have.

A natural pond of not more than twenty acres, owned by a common owner, is, by statute, a "private preserve." All waters over which the State has jurisdiction, except "private preserves" and "posted waters," are "public waters," the crossing of uncultivated land to reach which for the purpose of taking fish is declared not to be actionable unless actual damage was done. Acts of 1892, No. 80, ss. 1 and 31. It is therefore claimed that the waters in question are public waters, for that it is inferrable from the enactment that a natural pond of not more than twenty acres is a private preserve that a larger natural pond is public water, and that it cannot be assumed that the legislature intended that great ponds and lakes can be inclosed and thereby made private property and an exclusive right of fishing therein established in derogation of rights under the common law, and that therefore the defendant had a right to fish in said pond, and is not liable for crossing plaintiff's land to reach it, as it does not appear that the land was cultivated nor that actual damage was done. But the Constitution itself, in the provi-

sion under consideration, affords the test by which to deter-
mine over what waters the State has jurisdiction *de jure*,
thus, "and in like manner to fish in all boatable and other
waters (not private property) under proper regulations to
be hereafter made and provided by the General Assembly."
Thus was jurisdiction expressly reserved to the State over
boatable waters and other waters not private property. *State
v. Norton*, 45 Vt. 258; *Brew* v. *Hilliker*, 56 Vt. 641. Such
waters, therefore, are "public waters" within the statutory
definition of that term.   Hence, unless the waters in ques-
tion are boatable, they are not public, but private, and the
State has no jurisdiction over them.   But if they are boatable,
and therefore public, yet the defendant is liable in trespass
for crossing the plaintiff's land against its will to reach them,
though for the purpose of taking fish therefrom, notwith-
standing the statute of 1892 to the contrary, for otherwise
this would be taking private property for private use without
consent of the owner and without compensation, which the
Constitution does not allow to be done, even with compensa-
tion.   On this ground the flowage acts of 1866, 1867 and 1869
were held unconstitutional in *Tyler* v. *Beacher*, 44 Vt. 648. On
the same ground the drainage act of 1868, No. 26, was held
unconstitutional in the unreported case of *Abbott* v. *Ware*,
in Orange County, decided at the March Term, 1874, I think.
I remember that Judge Pierpoint said in disposing of that case,
that the legislature could as well pass a law that he might
pasture his cow in in his neighbor's pasture, as to pass one
that he might drain his swamp across his neighbor's meadow.
So in this case, it may with equal propriety be said that the
legislature could as well pass a law that any private prop-
erty may be crossed against the will of the owner for the
purpose of reaching a highway by land, as to pass one that it
may thus be crossed for the purpose of reaching public waters
for the purpose of taking fish therefrom.   The right of
eminent domain can never be exercised for any merely private

purpose, however much the public utility or convenience may be thereby subserved. Judge Isaac F. Redfield says that "the owner of one rood of land may stand in the way of any private enterprise, however much the general utility may be thereby hindered, and no human power in a free country where the principles of *Magna Charta* prevail in their full force, can compel him to budge one step." Note to *Allen* v. *Inhabitants of Jay*, 12 Am. Law Reg. N. S. 497.

*Judgment reversed and cause remanded.*

Tyler, J., did not sit in the case.

Thompson, J., dissents.

Dissenting opinion by

THOMPSON, J. With all due deference to the opinion of the majority of the court, I most emphatically dissent from their holding in respect to what constitute boatable waters within the meaning of section 40, Chapter 2 of the constitution of Vermont. This is solely a question of construction. Cooley, in his work on Constitutional Limitations (4th ed.), states some rules applicable to the solution of this question. He says :

"The object of construction, as applied to a written constitution, *is to give effect to the intent of the people adopting it*. In the case of all written laws, it is the intent of the lawgiver that is to be enforced. But this intent is to be found in the instrument itself. It is to be presumed that that language has been employed with sufficient precision to convey it, and unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it. 'Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.' Possible or even probable meanings, when one is plainly declared in the instrument itself,

the courts are not at liberty to search for elsewhere.   *   *
In interpreting clauses we must presume that *words have
been employed in their natural and ordinary meaning.*
Says Marshall, C. J. :  'The framers of the constitution,
and the people who adopted it, must be understood to have
employed words in their natural sense, and to have under-
stood what they meant.'   This is but saying that no forced
or unnatural construction is to be put upon their language ;
and it seems so obvious a truism that one expects to see
it universally accepted without question, but the attempt is
made so often by interested subtlety and ingenious refine-
ment to induce the courts to force from these instruments a
meaning which their framers never held, that it frequently
becomes necessary to redeclare this fundamental maxim.
Narrow and technical reasoning is misplaced when it is
brought to bear upon an instrument framed by the people
themselves, for themselves, and designed as a chart upon
which every man, learned and unlearned, may be able to
trace the leading principles of government.   *   *   *   It is a
maxim with the courts that statutes in derogation of the com-
mon law shall be construed strictly ; a maxim which we fear
is sometimes perverted to the overthrow of the legislative in-
tent ; but there can seldom be either propriety or safety in ap-
plying this maxim to constitutions.   When these instruments
assume to make a change in the common law, the change
designed is generally a radical one ; but as they do not go
minutely into particulars as do statutes, it will sometimes be
easy to defeat a provision, if courts are at liberty to say that
they will presume against any intention to alter the common
law further than is expressly declared.   A reasonable con-
struction is what such an instrument demands and should
receive ; and the real question is, what the people meant,
and not how meaningless their words can be made by the
application of arbitrary rules."   Cool. Con. Lim. 4th ed., 68,
69, 72, 74 and notes and cases cited.

The phrase "boatable waters" had no fixed technical
meaning at common law, nor does it appear that these words
were used by the common law in declaring the rights of the
public or individuals to fish in, or to use the waters subject
to its jurisdiction.   Hence, we are not called upon to give it
a technical meaning because of such use at the time of the

adoption of the constitution. In its natural, ordinary sense, the phrase "boatable waters" means waters boatable in fact without regard to the use to which such waters may be put for commercial or other purposes. Clearly the words are as susceptible of this meaning as they are of the interpretation put upon them by the majority of the court, which is that they mean "waters of common passage as highways," limiting the meaning of the words, "of common passage" by the cases and wealth of learning invoked by the learned judge who delivered the opinion of the majority. As thus limited this provision of the constitution, is applicable to only a very small part of the waters of the state. It is admitted that by incorporating this provision into the constitution, its framers intended to change the rule of the common law in respect to the right of the inhabitants of the state to fish in its waters. It is difficult to perceive how, as suggested by the majority, it is "unwarrantable to say that 'boatable' as used, was intended to embrace all waters boatable in fact." If they were as familiar with the common law and its apt language as is stated in the opinion of the majority, had the framers of the constitution intended that the words "boatable waters" should not include all waters boatable in fact, they would have used instead of these words, the apt phraseology of the common law and said "waters that are of common passage as highways," for their knowledge of the common law must have made them familiar with the meaning of the expression, "streams or rivers that are of common passage for the king's people." The fact that they did not use such language, but instead of it used the common language of the people and said "boatable waters," words pregnant with meaning to the minds of the early settlers of this state, and conveying the idea, in their natural and ordinary sense, of waters boatable in fact and no others, conclusively shows that they did not intend to use the words in the sense that the majority impute

to them. To give the meaning that the court reads into these words, it is compelled to go outside of the plain language of the constitution, and attempt to construe them in the light of extraneous circumstances.    This is a departure from the principles of constitutional construction cited from Cooley, and laid down by the best considered cases, because there is no ambiguity in the language used.    There is no pretense that at the time of the adoption of the constitution, the words ''boatable waters'' had a settled and well known signification in law, and a different meaning in popular use, or that they were then used in more senses than one.  But if we go outside the instrument itself to ascertain its meaning, then this provision of the constitution is to be read in the light of the circumstances and surroundings under which it was adopted, keeping in mind the evils it was intended to prevent, the rights intended to be conveyed, and the habits and customs of the people and the times in which they lived.    This provision has existed substantially as it now is from the time of the adoption of the constitution of 1777.    In the midst of the throes of the revolutionary war, our fathers founded a free republic in this state.    They were then smarting under the oppression and inequalities of the English system under which individual development among the common people was impeded and often prevented, and the rights and enjoyments of the many were subjected to the pleasure of a favored few.  Among the instrumentalities used to bring about this undesirable condition of life, were the iniquitous fish and game laws of England, enacted by the ruling class for their own enjoyment, and which led to a system under which the catching of a fish or the killing of a rabbit was deemed of more consequence than the happiness, liberty or life of a human being.    The framers of our constitution knew that the English system of fish and game laws had been a most fruitful source of crime and misery, and I think it was their purpose to so provide that this state should never be

cursed by a like system. They believed that the raising of men was of more importance than the breeding of fish for sport or for profit. I think they intended to use language so plain "that the wayfaring man though a fool," could understand it, and that by the words "boatable waters" they meant all waters boatable in fact, without regard to whether such waters could be utilized for conveying to market the products of the farm, the forest, the mine or the factory. In that early day and prior thereto, boats and canoes were among the principal means of locomotion in this state. In passing from one part of the state to another in those early times, the streams and ponds, great and small, were utilized, the boats or canoes being carried overland from one to the other, where connection could not be made by water. Thus the phrase "boatable waters," at the time of the original adoption of the constitution, conveyed to the minds of its framers and to the inhabitants of the state, the idea of waters boatable in fact. Such has been the continuous and universal construction given to these words and acted upon by the inhabitants of this state for more than a century. Until the St. 1892, No. 80, s. 1, (V. S., s. 4562,), defining a private preserve to be a natural pond of not more than twenty acres belonging to a common owner, such too was the construction put upon these words by the legislature ever after the adoption of the constitution as is evidenced by repeated enactments respecting fish in particular ponds, which under this decision must be private waters and private property in which the public have no right to fish.

It has been repeatedly held by the Supreme Court of the United States in respect to the constitution of the United States, that an interpretation of it, contemporary with its adoption, practiced and acquiesced in for years, conclusively fixes its construction. *Stuart* v. *Laird*, 1 Cranch 299, Law. ed 2 Book 115; *Martin* v. *Hunter*, 1 Wheat. 304, Law. ed. 4 Book 97; *Cohns* v. *Virginia*, 6 Wheat. 264 Law.

ed. S. Book 257 ; *Cooley* v. *Philadelphia Port Wardens,* 12 How. 299 Law. ed. 13 Book 996 ; *Pollock* v. *Bridgport Steamboat Co.,* 114 U. S. 411 ; Law. ed. 29 Book 147 ; Cool. Con. Lim. (4th ed.) 81–86. This court has . also recognized this doctrine repeatedly. *Huntington* v. *Bishop,* 5 Vt. 186 ; *State* v. *Keyes,* 8 Vt. 57 ; *State* v. *Bosworth,* 13 Vt. 402 ; *State* v. *Haley,* 52 Vt. 476 ; *State* v. *Magoon,* 61 Vt. 45 ; *Hall* v. *Armstrong,* 65 Vt. 421. In the last named case, this court said : "In view of the '*immemorial practice* of proceeding to trial without a jury,' in this form of action, and the other reasons which we have suggested in the course of this discussion, we hold that, under the constitution of this state, a party in an action of book account, is not entitled to a trial by jury on the merits of the case." In *Boyden* v. *Town of Brookline,* 8 Vt. 284, it was held that the contemporaneous construction of a statute and long established practice under it has the force of a judicial determination ; and that "such has always been the deference paid by courts to such an exposition of statute or constitutional law." In *Rogers* v. *Goodwin,* 2 Mass. 475, the court was urged to give a construction to a statute different from that which the people had given it for many years in their business transactions under it, but the court said :

"We cannot shake a principle which in practice has so long and extensively prevailed. If the practice originated in error, yet the error is now so common that it must have the force of law. The legal ground on which this provision is now supported is that long and contiuous usage furnished a contemporaneous construction, which must prevail over the mere technical import of the words."

Discussing a similar question it was said in *Packard* v. *Richardson,* 17 Mass. 122, that :

"A contemporaneous is generally the best construction of a statute. It gives the sense of a community, of the terms made use of by the legislature. If there is ambiguity in the language, the understanding and application of it, when the statute first comes into operation, sanc-

tioned by long acquiescence on the part of the legislature and judicial tribunals, is the strongest evidence that it has been rightly explained by practice. A construction under such circumstances becomes established law; and after it has been acted upon for a century, nothing but legislative power can constitutionally effect a change."

So far as I can learn no construction has ever been suggested for the words "boatable waters," except that for which I contend, by either the bench, the bar, or the inhabitants of the state, or any one else, until quite recently. Under the decisions this construction, contemporaneous with the adoption of the constitution and practiced for nearly one hundred and nineteen years, conclusively determines the meaning of these words to be as they have been so long construed and understood, and this court should now hold that "boatable waters" as mentioned in the constitution, are all waters boatable in fact.

It is a matter of common history, that within a very few years last past there have been, and now are, a few persons resident in this and other states, who have anxiously sought for some way by which they could convert into private fish preserves, controlled by themselves, many streams and ponds in this state, boatable in fact, and in which its inhabitants have fished as public waters ever since the adoption of the constitution of 1777. The idea that "boatable waters" to the minds of the fathers of this state, meant "waters of common passage," was originated and first broached by these persons thus seeking to obtain control of the waters of this state.

At the time of the adoption of the constitution of 1777, the common law had not been adopted by this state by legislative enactment; the state was not then a member of the federal union and, therefore, was not precluded from enacting laws or constitutional provisions impairing the obligation of contracts. The power of this state was then as omnipotent as that of the parliament of Great Britain, which could take

private property for public use without compensation. Potter's Dwarris on Stat. 44. It therefore had the power, notwithstanding any provisions in the New Hampshire or other grants to the contrary, to make waters boatable in fact, free to all its inhabitants for the purpose of fishing, under such proper regulations as might thereafter be provided by the general assembly. I am not prepared to say that by this section of the constitution, there was not reserved to the legislature the power of granting the right to our inhabitants, at suitable seasons of the year, to pass over private property to reach such waters for the purpose of fishing therein.

The opinion of the majority is based upon English cases, and the decisions of the courts of states having no constitutional provision like Vermont, and which follow the English cases, and upon the theory that the rule as enunciated by those decisions, is the common law of this state. By this assumption the fact is ignored that this state only adopted so much of the common law of England as is applicable to the local situation and circumstances, and is not repugnant to the constitution or laws of Vermont, and that such adoption was subsequent to the adoption of the constitution of 1777. If the construction of the constitution for which I contend, is correct, the principles of the common law upon which the decision of the court is based, are repugnant to our constitution, and, therefore, have never been adopted as a part of the common law of Vermont. St. 1779, St. 1782, in Slade's State Papers, 287, 450; V. S., s. 898; *State* v. *Burpee*, 65 Vt. 1; *Morrill* v. *Palmer*, 68 Vt. 6.

There is another circumstance which bears upon this question. "It is a notorious fact that when the country was new, all our waters swarmed with fish of various kinds." Thompson's Vermont Natural His. Division, 128. The early settlers as a rule were poor, and were often in great straits to procure the necessaries of life. On this account the early inhabitants of the state often resorted to the

fish abounding in its waters as a means of subsistence.    For this reason also, I think the framers of the constitution intended that the right to take fish in the waters of the state, should be limited only by the fact that the waters in which they were found were not boatable in fact.

When we consider the crime and misery in England during the last century resulting from its private fish and game preserves, protected by its system of fish and game laws, and then consider how free from such crime and misery this state has been during the same time, it is apparent that this provision of the constitution as construed by the people, was one of the wisest that could have been made.    This decision is most far reaching in its consequences.    Hitherto in our history as a state, our people, young and old, rich and poor, have fished as a matter of right in all the waters of the state, which were boatable in fact.    This freedom to associate with and enjoy nature, has borne fruit in the independent, liberty loving character of our people, and has had its influence in forming a type of manhood that has had a potent influence in making Vermont to-day in many respects, the ideal republic of the world.    The result of this decision is to change a large portion of such waters into private fish preserves and to exclude the inhabitants of this state from the rights which hitherto they have so freely enjoyed.

The holding of the court, as I understand it, is that only such waters are boatable within the meaning of the constitution, as may be utilized in conveying to market the products of the farm, the forest, the mine and the factory, and for transportation, or in other words, only such waters as may be utilized for the purposes of commerce and travel. If they may be so utilized, then they may also be used for pleasure.    The only door of escape left open by this decision, is the holding that in each case, the jury is to determine whether the waters in question can be so utilized. It may be that juries, moved by what an ancient law

writer quaintly terms "pious perjury," may preserve the rights of the people as they have been understood and enjoyed for more than a century. In my judgment a decision that tempts such a course on the part of the jurors to preserve what are supposed and believed to be ancient and constitutional rights, is a calamity much to be regretted.

In arriving at the conclusion to which it has come, it seems to me that the court has made a departure from the sound and well established principles of constitutional construction. I further deem its holding to be contrary to sound public policy, not conducive to good morals, and in effect a change of the constitution as it was intended by its framers and has been understood and acted upon by the inhabitants of this state throughout its entire history as a state.

The people must zealously guard their constitutional rights, especially of the kind involved in this case, if they would perpetuate them. If they lose such rights, it usually occurs by their being frittered away by legislative action, or unintentionally by judicial decision, without the extent of such action or decision being fully understood by the people. Believing this decision to be an infringement on and an impairment of their constitutional rights, I have deemed it to be my duty to express my dissent, feeling that I should be derelict in my duty if I failed so to do.