## Powell M. Cabot, Robert C. Cabot and Jocelyn Clark v. Robert G. Thomas, William J. Thomas and R. Kent Ouimette

[514 A.2d 1034]

No. 84-236

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed June 27, 1986

*Law Offices of George E. Spear II*, Swanton, for Plaintiffs-Appellees.

*John H. Fitzhugh* of *Sheehey Brue & Gray*, Burlington, for Defendants-Appellants.

*Jeffrey L. Amestoy*, Attorney General, and *John H. Chase*, Assistant Attorney General, Montpelier, for amicus curiae Vermont Agency of Environmental Conservation.

**Allen, C.J.** This is an appeal by defendants from a superior court order permanently enjoining them from "hunting, shooting, trapping, or entering upon" plaintiffs' marshlands beyond the normal low water line of Charcoal Creek. We modify the order and affirm it as modified.

The material facts in this case are undisputed. Plaintiffs and their immediate predecessors in title have owned a tract of marshland of approximately 360 acres near West Swanton, Vermont since 1933. Charcoal Creek borders the western portion of their marsh. The creek, so-called, is actually an inlet from Lake Champlain. At its source, the creek connects through a narrow opening to the lake. It ultimately arrives at a dead end in a wooded area.

Although the level of Charcoal Creek is subject to periodic fluctuations, the parties agree it has a definite low water line along plaintiffs' marsh at 93.055 feet above mean sea level. At this low water line the marsh owners have since 1949 posted signs proclaiming: "No Hunting, Shooting, or Trapping."

On October 3, 1979, the water level was 95.36 feet above sea level. Thus, it rose well above the low water line and covered a portion of plaintiffs' land beyond the signs. An area of the marsh designated Jake Nokes Slough was inundated at that time. During drier seasons this slough was soft mud and bog and was separated from Charcoal Creek by a ridge of land.

Defendants entered Jake Nokes Slough from Lake Champlain by way of Charcoal Creek in a sixteen-foot flat bottom boat on October 3, 1979. They were aware of the plaintiffs' signs and of having passed beyond the signs, as they had done previously. Intending to hunt ducks, defendants stopped their boat in a weed bed two hundred yards to the inland side of the signs. The bottom of the boat rested in the mud at a point where the water was approximately five or six inches deep.

A police officer told the defendants they were hunting on private posted land. When they announced their intent to continue hunting there, the officer cited them for criminal trespass and poaching. Based on these facts, plaintiffs then sought and received the injunction which is the subject of this appeal.

As a definite low water line exists along Charcoal Creek, plaintiffs' ownership extends to that line. *State* v. *Cain,* 126 Vt. 463, 468, 236 A.2d 501, 505 (1967); *Hazen* v. *Perkins,* 92 Vt. 414, 419, 105 A. 249, 251 (1918). Defendants contend, however, that notwithstanding private ownership of the underlying lands, the public enjoys the right to hunt from boats on the waters overlying plaintiffs' marsh to the ordinary *high* water line.

Essentially, defendants and amicus curiae, the Vermont Agency of Environmental Conservation, argue that the public has a navigational easement across the waters overlying plaintiffs' land between the ordinary low and high water lines, and that this easement permits recreational uses as well. Among the recreational uses the public enjoys as of right, according to defendants and amicus curiae, are hunting and fowling.

Marshland adjoining Charcoal Creek has been the *locus in quo* of trespass actions between landowners and hunters since before the turn of the century. Hunters and marsh owners have pressed their respective claims of right with remarkable persistence.

In the late 1890's, W.G. Payne, an earlier landowner along this same creek, commenced a trespass action against Watson Gould,

a hunter.[1] Eventually, in *Payne* v. *Gould,* 74 Vt. 208, 52 A. 421 (1902), the hunter prevailed because the owner had not sufficiently enclosed his land. This Court concluded that Gould was simply exercising his state constitutional right to hunt on "lands not enclosed." *Id.* at 210-11, 52 A. at 422.

Subsequent landowners, including the immediate predecessor in title of plaintiffs Cabot, sought court sanction of their destruction of a hunting guide's duck blinds which they alleged were situated in their marsh. Although the case came before this Court on a collateral matter, the primary focus of the underlying dispute was the western boundary of the privately owned marshland along Charcoal Creek. See *Cabot* v. *Hemingway,* 115 Vt. 321, 322, 58 A.2d 823, 823-24 (1948). At that time, the Court indicated in dictum that establishing the westerly boundary would determine if the duck blinds in question could properly have been maintained where they had been placed. *Id.* at 322, 58 A.2d at 823. In 1949, a Franklin County court determined that the marsh's western boundary was the low water line along the creek at 93.055 feet above mean sea level. The owners of the marsh thereafter moved their signs to that line and have maintained them there ever since.

As was earlier intimated, recent duck hunters have been more inventive: they assert a public right of recreational use, including hunting, on the waters of Lake Champlain and its inlet creeks all the way to the normal high water line without regard to the ownership of the underlying land. This appeal is the second time the present defendants have presented us with such an argument. Their appeal of conditional guilty pleas in the criminal case growing out of this same incident involved an improper vehicle for presenting their claims. *State* v. *Thomas,* 140 Vt. 403, 405, 438 A.2d 400, 401-02 (1981).

The questions raised in this case and in prior Charcoal Creek controversies lie at the crosscurrents of two important concerns: the individual's desire for private enjoyment of privately owned land and the public's wish for sporting access to the forests, fields, and waterways of this state. These are concerns that have long been in conflict.

---

[1] Gould was not the only hunter W.G. Payne sued for trespass. See *Payne v. Sheets,* 75 Vt. 335, 55 A. 656 (1903).

In the colonial period, residents of the New Hampshire grants (what was later to be Vermont) were well aware of the history of abuses that had occurred in England under authority of fish and game laws:

> They were then smarting under the oppression and inequalities of the English system under which individual development among the common people was impeded and often prevented, and the rights and enjoyments of the many were subjected to the pleasure of a favored few. Among the instrumentalities used to bring about this undesirable condition of life, were the iniquitous fish and game laws of England, enacted by the ruling class for their own enjoyment, and which led to a system under which the catching of a fish or the killing of a rabbit was deemed of more consequence than the happiness, liberty or life of a human being.

*New England Trout & Salmon Club* v. *Mather,* 68 Vt. 338, 353, 35 A. 323, 328 (1896) (Thompson, J., dissenting).

One response to the sometimes conflicting concerns of the individual and the larger group of society was Chapter II, Section 39 of the Vermont Constitution of 1777. Now found at Chapter II, Section 67, this provision guarantees to the public the "liberty," subject to legislative regulation, to hunt and fish in certain places:

> The inhabitants of this State shall have liberty in seasonable times, to hunt and fowl on the lands they hold, and on other lands not enclosed, and in like manner to fish in all boatable and other waters (not private property) under proper regulations, to be made and provided by the General Assembly.

Section 67 is an accommodation of competing goals. It offers a general delineation of not only the respective rights of landowners and sportsmen but also the authority of government to regulate those rights in the context of hunting and fishing.

Understanding Section 67 requires a knowledge of the common law which it altered. English law, as we received it, treated hunting on privately owned land as a personal privilege of the landowner. See, e.g., *Sterling* v. *Jackson,* 69 Mich. 488, 497, 37 N.W. 845, 851 (1888) ("[s]ince every person has the right of exclusive dominion as to the lawful use of the soil owned by him, no man

can hunt or sport upon another's land but by consent of the owner").

Waterways overlying private property were not in every instance entirely private, however. Tidal waters could not be privately owned. See *Mather, supra,* 68 Vt. at 342, 35 A. at 324. Although an individual could own inland lakes and rivers, the public could use them for navigational purposes if the waterways were susceptible to use for commercial passage and transportation. *Id.* at 342-43, 35 A. at 324. Thus, the common law recognized a "public easement" for navigation on such waters. *Id.* at 347, 35 A. at 326.

This public right of passage did not initially include a right to fish or hunt on nontidal waterways. The right of fishery was personal to the owner of the underlying land. See 1 R. Clark, Waters and Water Rights 182 (1967). Also personal to the landowner was the right to hunt and fowl on those overlying waters. See, e.g., *Schulte* v. *Warren,* 218 Ill. 108, 122, 75 N.E. 783, 786 (1905); *Sterling* v. *Jackson, supra,* 69 Mich. at 501, 37 N.W. at 853; *Fisher* v. *Barber,* 21 S.W.2d 569, 570 (Tex. Civ. App. 1929).

Chapter II, Section 67 extended rights to citizens which the common law had not recognized. Cf. *Payne* v. *Sheets, supra,* 75 Vt. at 347, 55 A. at 660 ("the common law . . . is somewhat modified [by Section 67]"). It recognized rights to hunt and fish, given certain circumstances, in what had previously been the landowner's private domain.

In *New England Trout & Salmon Club* v. *Mather, supra,* this Court, focusing on the right to fish, reasoned that the constitutional provision at issue does more than just recognize a right to fish in boatable waters under appropriate legislative regulation; it also:

> affords the test by which to determine over what waters the State has jurisdiction *de jure,* thus, "and in like manner to fish in all boatable and other waters (not private property) under proper regulations to be hereafter made and provided by the General Assembly." Thus was jurisdiction expressly reserved to the State over boatable waters and waters not private property. . . . Hence, unless the waters in question are boatable, they are not public, but private, and the State has no jurisdiction over them.

*Mather, supra,* 68 Vt. at 348-49, 35 A. at 326 (citations omitted); see also *Boutwell* v. *Champlain Realty Co.,* 89 Vt. 80, 89, 94 A. 108, 112 (1915). By imposing the boatability requirement, Section 67 also limits the State's authority to enforce and regulate an easement across waters overlying an individual's private land. In this way, Section 67 incorporates protections for landowners as well as for those who fish.

*Mather's* reasoning in the context of fishing applies equally to Section 67's hunting provision. By virtue of Section 67, the State has authority to permit and regulate public hunting on private property, but only when that land is not enclosed.

█ If landowners fail to take adequate measures to enclose their lands, then individuals who hunt there without first seeking permission would not normally be trespassers. *Payne* v. *Gould, supra,* 74 Vt. at 210-11, 52 A. at 422. We believe that the presence of water, whether boatable or nonboatable, is irrelevant for purposes of Section 67's right to hunt on nonenclosed, privately owned land. By attaching "boatable waters" and "lands not enclosed" limitations on the respective rights of fishing and hunting, the Vermont Constitution has designated those points beyond which private property becomes inviolate for fishing and hunting purposes—nonboatability for the former and enclosure for the latter. Development of the common law must, of course, accommodate these constitutional principles.

Defendants correctly state that most states now interpret their common law to extend the navigational easement to include most water-related recreational activities, including hunting from boats. 1 Clark, *supra,* at 198-99. As noted previously, this was not always so. Moreover, those states do not have provisions like Chapter II, Section 67 of the Vermont Constitution to limit the evolution of their common law.

Nothing in Section 67 suggests that its framers intended that boatability would be the standard for hunting either from boats or while standing in water. Indeed, since the provision uses a single standard for "hunting and fowling," applying a separate standard for hunting waterfowl would comport neither with common logic nor with normal use of language. Accordingly, we conclude that the appropriate inquiry in the present case is whether the

private lands were enclosed.[2] Such a disparate treatment of hunters and fishers is rational since hunting is normally more dangerous to and intrusive of the landowner's interests.

The lower court found that plaintiffs posted their lands in compliance with 10 V.S.A. § 5201. Defendants do not dispute that the boundary along Charcoal Creek was sufficiently marked to be enclosed according to the terms of Chapter II, Section 67. In view of defendants' stated intent to continue hunting in plaintiffs' marsh, the superior court did not err when it "enjoined [defendants] from hunting, shooting, [or] trapping . . . upon the lands of the [p]laintiffs . . . ."

The court did not stop there, however. It also enjoined "entering upon the lands of [p]laintiffs, by boat or otherwise, at any point behind their boundary line or as marked by [p]laintiffs' posters . . . ." We cannot find support in the court's findings for such a broad injunction. This portion of the court's order plainly implicates the boatability aspects of the common law's navigational easement and Section 67's guarantee to those who fish. The sole basis for this part of the superior court's injunction appears to be the nonboatability of the water at that point where defendants' boat was resting in the mud on October 3, 1979. Water level on a single day will not normally support a finding of boatability or nonboatability for a body of water subject to seasonal fluctuations. See *Mather, supra,* 68 Vt. at 347, 35 A. at 326 ("if [the lake's or stream's] periods of high water ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement"). Nor, logically, can an injunction affecting a large area rest on a finding merely that a single point in that area is nonboatable.

We accordingly affirm the superior court's injunction order as it pertains to hunting, shooting, or trapping, and we strike that portion of the order which prohibits entering by boat upon the waters overlying plaintiffs' land.

*Affirmed as modified.*

---

[2] We are aware that in some sports the line between hunting and fishing might not be perfectly clear. In the present case, however, defendants plainly were hunting.