# State of Vermont v. Robert Kirchoff

[587 A.2d 988]

No. 87-603

Present: Allen, C.J., Peck, Dooley and Morse, JJ., and Springer, D.J. (Ret.),
Specially Assigned

Opinion Filed January 25, 1991

John Quinn, Addison County State's Attorney, Middlebury, and Jo-Ann Gross, Legal Intern, Department of State's Attorneys, Montpelier, for Plaintiff-Appellee.

Walter M. Morris, Jr., Defender General, Henry Hinton, Appellate Defender, and David J. Williams, Special Defender for Drug Offenses, Montpelier, for Defendant-Appellant.

**Morse, J.** The sole issue in this appeal from a conviction for cultivating marijuana is the legality under the Vermont Constitution of a warrantless search of defendant's posted land. We hold that this search violated Chapter I, Article 11, of the Vermont Constitution, and accordingly reverse.

In 1982, defendant purchased thirty-nine acres of land, consisting of woods, swamp, and meadows, in an isolated part of Lincoln, Vermont. He put up several "no trespassing" signs where the road turned into his driveway and posted his land with signs that said, "POSTED Private Property. Hunting, Fishing, Trapping or Trespassing for Any Purpose Is Strictly Forbidden. Violators Will Be Prosecuted," and recorded that fact with the town clerk. See 10 V.S.A. § 5201. Although he gave specific permission to certain neighbors to ride their bikes on trails that crossed his land, defendant took actions to keep strangers off his property.

Acting on an informant's tip that marijuana was growing on defendant's land, a sheriff and another law enforcement officer went onto the land, without a warrant, in September of 1986. They first drove up defendant's driveway where they noticed the "no trespassing" signs, as well as one that read "Road

Ends—Private Drive Ahead." The officers parked at a neighbor's house, crossed a fence, and walked along an old logging road toward defendant's house. They observed one or two old "no trespassing" signs as they walked. At some point, the officers left the road and walked through woods and a marsh, coming upon a marijuana patch about 100 yards from defendant's house. The marijuana plants were not visible from any road.

The officers left the area to obtain a search warrant. Two other officers arrived to watch over the patch while waiting for the warrant. Defendant was there tending the plants and was confronted by the officers. He was talkative and confessed to cultivating marijuana. Later, after the warrant arrived, the officers searched the house, finding more evidence of marijuana cultivation and seizing numerous plants.

Defendant moved to suppress the evidence gathered during the search on the ground that it was obtained in violation of the Vermont Constitution. The motion was denied, and the evidence was admitted over defendant's objection at trial.

## I.

We begin by acknowledging that this "walk-on" search would be permissible under the federal constitution. The United States Supreme Court has held that the Fourth Amendment permits the police to conduct a warrantless search of an area in which a person does not have a "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). In *Oliver v. United States*, 466 U.S. 170, 179 (1984), that Court held that an expectation of privacy in "open fields" will not be deemed reasonable for Fourth Amendment purposes. That is, "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* at 178; see *State v. Byrne*, 149 Vt. 224, 227, 542 A.2d 276, 278 (1988). "Open fields" is a term of art and denotes areas that may be neither open nor fields as those words are used in common speech; it refers generally to land that is unoccupied or undeveloped. *Oliver*, 466 U.S. at 180 n.11. Woods, in particular, may be open fields. As the warrantless search in this case was not of "the area immediately surrounding the home," an area known in law as "the curtilage," defendant's Fourth Amendment rights were not violated.

4

The Court in *Oliver* also gave a textual and historical explanation for its conclusion that the Amendment's framers "would have understood the term 'effects' to be limited to personal, rather than real, property." 466 U.S. at 177 n.7. On that basis, as well as "expectation-of-privacy" grounds, the Court found open fields to be outside the scope of the Fourth Amendment.

## II.

That the officers' conduct was permissible under the federal constitution does not, of course, end our inquiry. The Vermont Constitution may afford greater protection to individual rights than do the provisions of the federal charter. *State v. Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982). The issue is whether the "walk-on" search violated Chapter I, Article 11, of the Vermont Constitution. Article 11 provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

There are two notable textual differences in the language of the federal and state provisions. First, the Fourth Amendment guarantees freedom from "unreasonable searches and seizures"; Article 11 by contrast does not contain the word "unreasonable." We have held, however, that "[r]egardless of this difference, . . . the word 'unreasonable' is as implicit in Article Eleven as it is express in the Fourth Amendment." *State v. Record*, 150 Vt. 84, 85, 548 A.2d 422, 423 (1988) (upholding warrantless vehicle stops).

Second, and more to the point here, the Vermont Constitution protects persons, houses, papers, and *possessions*, while the Fourth Amendment protects persons, houses, papers, and *effects*. Unfortunately, research into the possible significance of this textual difference sheds little light on the issue. While our research suggests that, at the time the Vermont Constitution

was adopted, the word "possessions" in certain contexts would have included all real estate over which an individual exercised a certain degree of control, McCabe, *State Constitutions and the "Open Fields" Doctrine: A Historical-Definitional Analysis of the Scope of Protection Against Warrantless Searches of "Possessions,"* 13 Vt. L. Rev. 179 (1988) (term "possessions" meant personalty, realty, or both), it also suggests that the word "effects" would have been susceptible to a similar definition. *Webster's New International Dictionary* 818 (2d ed. 1961) (term "effects" sometimes means real property). From a definitional standpoint, in many contexts the two words were, and remain, largely interchangeable. See *People v. Smith*, 420 Mich. 1, 20, 360 N.W.2d 841, 849 (1984). The word "effects" is now construed narrowly by the United States Supreme Court, but that does not obscure the fact that it was often given a broader meaning in the late eighteenth century. F. Stroud, Stroud's Judicial Dictionary 603–05 (2d ed. 1903).

Perhaps such endeavors would prove more useful if the drafters of the Vermont Constitution had left a more complete historical record. Unfortunately, the Vermont Constitution was adopted with little recorded debate. Shaeffer, *A Comparison of the First Constitutions of Vermont and Pennsylvania*, in *In a State of Nature: Readings in Vermont History* 54, 58 (Muller & Hand eds. 1982). It borrowed from several other state constitutions and included a few unique passages. *Id.* Most commentary focuses on those portions that were unique to Vermont rather than those, like Article 11, which were copied practically verbatim from other state constitutions. See *id.* The paucity of historical record prompts us to look elsewhere when determining the breadth of those individual rights the Vermont Constitution was drafted to protect.

We are not the first state to address this issue, but a survey of those states that have offers little guidance. Several states having constitutions with language similar to Article 11 have found that the term "possessions" does not include all real estate in which an individual has a possessory interest, effectively giving it the same meaning that the federal courts give to the term "effects." *State v. Pinder*, 128 N.H. 66, 74, 514 A.2d 1241, 1245–46 (1986) (term "possessions" in New Hampshire Constitution does not include real property beyond curtilage); *Brent v. Com-*

*monwealth*, 194 Ky. 504, 509–10, 240 S.W. 45, 47–48 (1922) (term "possessions" means "the intimate things about one's person"). Other states with similar constitutional language, however, have held that the word "possessions" does result in broader protection for their citizens than that granted under the current interpretation of the Fourth Amendment. See, e.g., *Falkner v. State*, 134 Miss. 253, 257–61, 98 So. 691, 692–93 (1924) (term "possessions" "embraces all of the property of the citizen"). Furthermore, some states whose constitutions contain the same language as that used in the federal constitution have found nonetheless that their constitutions afford greater protection of individual rights when it comes to issues of search and seizure. See, e.g., *State v. Dixson/Digby*, 307 Or. 195, 208–12, 766 P.2d 1015, 1022–24 (1988).

Our decision, however, need not rest on the drafters' choice of one word over another. Even if we cannot say with confidence that the scope of the term "possessions" mandates a right of privacy in real estate, it certainly does not rule out such a right. We strive to honor not merely the words but the underlying purposes of constitutional guarantees, and to give meaning to the text in light of contemporary experience. "We do not construe constitutional provisions of this sort the way we do statutes, whose drafters can be expected to indicate with some comprehensiveness and exactitude the conduct they wish to forbid or control and to change those prescriptions when they become obsolete." *Oliver*, 466 U.S. at 186–87 (Marshall, J., dissenting) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819)). Instead, our duty is to discover and protect the core value that gave life to Article 11. In the case of Fourth Amendment-Article 11 jurisprudence, the value traditionally protected is "freedom 'from unreasonable government intrusions into . . . legitimate expectations of privacy.'" *Oliver*, 466 U.S. at 187 (Marshall, J., dissenting) (quoting *United States v. Chadwick*, 433 U.S. 1, 7 (1977)).

If we confined the meaning of "possessions" to personalty for Article 11 purposes, we would necessarily run counter to the federal development of the even narrower word "effects" found in the Fourth Amendment. In numerous cases, the United States Supreme Court has extended protection beyond the plain meaning of the places and things enumerated in the

Fourth Amendment. *Katz*, for example, upheld a person's right to privacy while talking in a public telephone booth, although the telephone booth is not a person, house, paper or effect because "the Fourth Amendment protects people—and not simply 'areas.'" 389 U.S. at 353. Other cases have established protection from warrantless searches of commercial premises, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311 (1978), and hotel rooms, *Hoffa v. United States*, 385 U.S. 293, 301 (1966). "Curtilage" is protected, even though that word is nowhere to be found in the Fourth Amendment.

The incompatibility of the narrow textual rationale in *Oliver* with the Court's broader doctrinal approach in its prior Fourth Amendment jurisprudence perhaps explains why the Court in *Oliver* felt constrained to show that the result was also justified under the "reasonable-expectation-of-privacy" rubric. In our opinion, the *Oliver* Court misinterpreted its own Fourth Amendment precedent, as expressed in *Katz* and its progeny. We believe Article 11 embraces the core value of privacy discarded in *Oliver*.

█ Our more concrete task is to determine the scope of Article 11 in prohibiting warrantless searches of protected areas. Vermont cases have recognized certain "well-delineated exceptions" to the warrant requirement. See *State v. Wood*, 148 Vt. 479, 483, 536 A.2d 902, 905 (1987). For example, we recently decided that warrantless vehicle stops in certain circumstances are permissible under Article 11. *Record*, 150 Vt. at 90, 548 A.2d at 426; *State v. Jewett*, 148 Vt. 324, 330, 532 A.2d 958, 961 (1987). Moreover, we emphasize that a person cannot rely on Article 11 to protect areas or activities that have been willingly exposed to the public. Article 11 protects the people from governmental intrusion into their private affairs; to the extent their affairs are willingly made public, the provision has no application. Thus, "Article 11 does not protect one who, by opening up his or her home to those who wish to take part in illegal activity, exposes such activity to undercover police officers." *State v. Zaccaro*, 154 Vt. 83, 91, 574 A.2d 1256, 1261 (1990). This principle is axiomatic in federal law. See, e.g., *Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

Consequently, while Article 11 "defines a right dependent on a possessory interest," *Wood*, 148 Vt. at 489, 536 A.2d at 908, and people undoubtedly have a possessory interest in the land they own or occupy, not all state intrusions onto private lands violate Article 11. We must define the contours of the right to privacy in open fields by determining when activities in open fields are sufficiently private to warrant constitutional protection and when, on the other hand, they are sufficiently public not to deserve protection.

### III.

The Supreme Court in *Oliver* concluded that privacy in land beyond the curtilage can never be constitutionally sanctioned. The Court reasoned that society does not recognize a reasonable expectation of privacy in open fields because they "do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." 466 U.S. at 179.

While generally there is not an expectation of privacy in unoccupied lands, such is not the case where the landowner has taken steps, such as fencing or posting, to indicate that privacy is exactly what is sought. The *Oliver* Court informs us that an individual's expectations of privacy in land—regardless of steps taken to establish that expectation—can never be legitimate. *Id.* at 182. This per se approach cannot be squared with Article 11—nor, we believe, can it be squared with the Fourth Amendment principles of *Katz.* Undoubtedly, people will confine their "intimate activities" to narrower areas as "government interference or surveillance" grows more intrusive and pervasive. But constitutional rights should not succumb to waning expectations or fluctuations in the degree of government intrusion "society" is willing to condone.

The Supreme Court in *Oliver* appears to equate privacy with crime, stating that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," *id.* at 182, and adding: "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." *Id.* at 182 n.13. If one assumes at the outset that people will only seek privacy in the use of their land

for criminal purposes, the conclusion that society will not recognize a claim to privacy in the land readily follows. But we cannot presume how an individual will employ private lands—that is the nature of privacy. Constitutional guarantees inevitably protect some criminal activity in securing the rights of all of us.

Even assuming that society's perception of what is reasonable is the relevant standard for measuring constitutional rights, *Oliver*'s conclusion is an *ipse dixit*. The Court sought to rationalize the *Katz* test with Oliver Wendell Holmes's declaration in 1924 that "open fields" are not among the places protected by the Fourth Amendment. *Hester v. United States*, 265 U.S. 57, 59 (1924). But there is no empirical evidence on whether society is willing to recognize an expectation of privacy in "open fields" as reasonable or unreasonable. Certainly, it was a bold and unsupported pronouncement in *Oliver* that society is not prepared under any circumstances to recognize as reasonable an expectation of privacy in all lands outside the curtilage. Indeed, the fact that society may adjudge one who trespasses on such lands a criminal belies the claim. See 13 V.S.A. § 3705.

The Court's conclusion was justified in part by its view that "a case-by-case approach [would not] provide a workable accommodation between the needs of law enforcement and the interests protected by the Fourth Amendment." *Oliver*, 466 U.S. at 181. The Court was concerned that "[t]he ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority; it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced." *Id.* at 181–82 (citation omitted). We do not believe, however, that the difficulty of determining the degree of privacy to afford a particular "open field" is any greater than the difficulty in deciding, case by case, whether a search has invaded the curtilage—a question that must be faced if *Oliver* is followed and that has proved vexing to the courts. See, e.g., *United States v. Dunn*, 480 U.S. 294 (1987) (listing criteria for identifying curtilage, including steps landowner has taken to protect area from observation); *United States v. Van Dyke*, 643 F.2d 992, 994 (4th Cir. 1981) ("isolated, rural area," "secluded setting," and "no trespassing" signs are all factors in determining that curtilage extended 150 feet from residence). Furthermore, the police and courts are accustomed to enforcing the law against trespass, 13

V.S.A. § 3705; deciding whether a search intrudes upon protected Article 11 interests will in most cases be no more arduous. See *Oliver*, 466 U.S. at 195–96 (Marshall, J., dissenting). In any event, however easy the bright-line test of *Oliver* is to apply, the test simply fails to do justice to the values underlying Article 11.

IV.

█ We stated recently that Article 11 protects the people of the state "from unreasonable, warrantless governmental intrusion into affairs which they choose to keep private." *State v. Zaccaro*, 154 Vt. at 91, 574 A.2d at 1261. *Oliver*'s per se rule, that a person may never legitimately demand privacy under the Fourth Amendment in land beyond the borders of the curtilage, fails to guarantee that right. We now hold that a lawful possessor may claim privacy in "open fields" under Article 11 of the Vermont Constitution where indicia would lead a reasonable person to conclude that the area is private. On the other hand, Article 11 does not afford protection against searches of lands where steps have not been taken to exclude the public. By this standard, we seek to protect the constitutional rights of those who have sought privacy in their lands, while not preventing police from using evidence of affairs that were not kept private—that were, in *Katz*'s terms, "knowingly expose[d] to the public." 389 U.S. at 351.

█ Where the indicia, such as fences, barriers or "no trespassing" signs reasonably indicate that strangers are not welcome on the land, the owner or occupant may reasonably expect privacy. "Allowing the police to intrude into private land, regardless of the steps taken by its occupant to keep it private, would be a significant limitation on the occupant's freedom from governmental scrutiny." *State v. Dixson/Digby*, 307 Or. at 211, 766 P.2d at 1024 (no per se "open fields" doctrine under Oregon constitution). The inquiry is objective—whether a reasonable person should know that the occupant has sought to exclude the public. Whether the steps taken are adequate for this purpose will depend on the specific facts of each case. The standard for criminal trespass is similar. 13 V.S.A. § 3705(a) provides that a person shall be subject to criminal penalties

if, without legal authority or the consent of the person in lawful possession, he enters or remains on any land or in any place as to which notice against trespass is given by:

(1) Actual communication by the person in lawful possession or his agent or by a law enforcement officer acting on behalf of such person or his agent; or

(2) Signs or placards so designed and situated as to give reasonable notice.

This portion of our holding follows the rule fashioned by the Oregon Supreme Court: "A person who wishes to preserve a constitutionally protected privacy interest in land outside the curtilage must manifest an intention to exclude the public by erecting barriers to entry, such as fences, or by posting signs." *Dixson/Digby*, 307 Or. at 211–12, 766 P.2d at 1024. It also approximates the view of the majority of courts that have addressed the lawfulness of official searches of open fields under the Fourth Amendment during the years between the Supreme Court's decisions in *Katz* in 1967 and *Oliver* in 1984. Those courts hold that an expectation of privacy in land outside the curtilage may be legitimate in certain circumstances and that the per se approach is inconsistent with *Katz*. Note, Florida v. Brady: *Can* Katz *Survive in Open Fields?*, 32 Am. U.L. Rev. 921, 930 (1983) (citing cases). "The large majority [of courts] . . . have harmonized the *Hester* and *Katz* decisions by holding that the Fourth Amendment does not apply to searches and seizures made pursuant to observations across open fields where the area observed is not subject to a reasonable expectation of privacy." *Sproates v. State*, 58 Md. App. 547, 559–60, 473 A.2d 1289, 1295 (1984) (citing cases). In *Sproates*, for example, the court concluded, after canvassing the cases, that the defendant had not shown even a subjective expectation of privacy in the area searched where no signs or fences precluded entry onto the land. *Id.* at 565, 473 A.2d at 1298.

Vermont law allows persons to enter lands for certain purposes under certain conditions. Chapter II, § 67, of the Vermont Constitution grants the people of this state the liberty "in seasonable times, to hunt and fowl on the lands they hold, and on other lands not inclosed . . . under proper regulations." Furthermore, 10 V.S.A. § 5212 limits a landowner's liability in negligence when the owner "gratuitously gives another permission,

either actual or implied," to enter upon unposted land for "recreational purposes," such as "hunting, fishing, trapping, hiking, gathering wildflowers or berries, birdwatching, horseback riding, picnicking, swimming, skiing, snowshoeing and similar activities." These provisions evidence the state's policy of providing the public with certain privileges and liberties not permitted under the common law. See *Cabot v. Thomas*, 147 Vt. 207, 211–12, 514 A.2d 1034, 1037–38 (1986). They evidence no intent, however, to limit the right of landowners to pursue their affairs free from unregulated intrusion by officials.

## V.

■ Although we reject the per se rule in *Oliver*, the inquiry we have described does not wholly cast aside the reasonable-expectation-of-privacy framework that has ordered Fourth Amendment jurisprudence since *Katz* in 1967 and has been reiterated in the case law since. See, e.g., *Florida v. Riley*, 488 U.S. 445, 450–51 (1989). For several reasons, however, we are reluctant to use the phrase "reasonable expectation of privacy." First, it connotes certain results, as in *Oliver*, that do not obtain under Article 11. Second, the phrase may be misunderstood to reflect merely what society will at any given moment recognize as reasonable. That is indeed the gloss given to the test by Justice Harlan in his influential concurrence in *Katz*, 389 U.S. at 361 (and repeated in *Oliver*, 466 U.S. at 177): "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Yet what society is prepared to recognize as reasonable shifts with political winds and the perceived exigencies of the day, and should not be the measure of individual rights under state and federal constitutions—which, in our view, are to be *protected*, even from those intrusions that society may be prepared at the moment to tolerate. The question is not what society is prepared to accept but what the constitution requires.

Third, as the reasonable-expectation-of-privacy test is applied in federal law, constitutional rights diminish with advances in technology. Under *Oliver*, an expectation of privacy

that was at one time reasonable may no longer be, if, during the interim, people have adjusted to technologies that encroach on privacy. This reasoning makes us uneasy, for our role is to protect constitutionally guaranteed privacy, not to acquiesce in its erosion if and as people's expectations ebb. "[W]e strive, when interpreting these seminal constitutional provisions, to effectuate their purposes—to lend them meanings that ensure that the liberties the Framers sought to protect are not undermined by the changing activities of government officials." *Oliver*, 466 U.S. at 187 (Marshall, J., dissenting).

██ Finally, we differ from federal doctrine by placing on the State the burden to prove that a warrantless search of open fields is not prohibited under the principles we announce today. Federal law places the burden on the defendant to establish a reasonable expectation of privacy in the area searched in order to claim rights under the Fourth Amendment. Thus, under federal law, the open fields doctrine is not generally treated as an exception to the warrant requirement—the burden is always on the State to establish an exception, see *Katz*, 389 U.S. at 357 ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment")—but as a rule limiting the scope of the Fourth Amendment in the first instance. But see *State v. Verhagen*, 86 Wis. 2d 262, 269, 272 N.W.2d 105, 108 (Ct. App. 1978) (holding that "the burden of proving that the evidence was seized in an open field, in common with other exceptions to the warrant requirement, rests with the State"). In contrast, we view government searches of a person's land as presumptively implicating Article 11, and consequently the State has the burden of proving that such a search does not violate Article 11. See *State v. Dixson/Digby*, 307 Or. at 212, 766 P.2d at 1024 (burden on State to prove no violation of Oregon constitution in official search of land beyond curtilage); cf. *State v. Zaccaro*, 154 Vt. at 87, 574 A.2d at 1259 (search warrant not required under Article 11 where State proves that defendant voluntarily consented to officer's entry).

In the end, it matters little whether we use the phrase "reasonable expectation of privacy" or some variant. (Justice Potter Stewart, writing for the Court in *Katz*, asked whether the government's activities violated the privacy upon which the defend-

ant "justifiably relied." 389 U.S. at 353.) Our fundamental divergence from federal law, in the present case, lies not in the name given to the test but in the manner in which the test is understood and applied in the specific context of "open fields."

## VI.

There will undoubtedly arise cases where the question of the legitimacy of a possessor's expectation of privacy in a particular area is a close one. In this case, we need not explore nice distinctions. By no stretch of the imagination could the officers reasonably conclude, under the standards we have set out here, that their "walk-on" search was permissible. Given the extensive posting of the land, defendant's intent to exclude the public was unequivocal. On these facts, we find that the officers' walk over defendant's logging roads and through his woods violated his right to privacy under Article 11, and the evidence obtained thereby may not be used against him.

We appreciate the concern that drug-related activities are a major social problem. We do not believe, however, that the solution is a declamation of martial law that reduces the warrant requirement to an easily discarded "technicality." The rule announced here does not significantly hamper the police from investigating suspected criminal activity. It does require police to obtain a warrant, based upon probable cause, before they enter land where it is apparent to a reasonable person that the owner or occupant intends to exclude the public. The rule brings the practice of law enforcement into compliance with our fundamental law, which empowers the judiciary to guard the rights of the people through the warrant process.

*Reversed.*

**Springer, D.J.** (Ret.), Specially Assigned, concurring. This case demonstrates the difficulty in addressing present-day questions under rules laid down two hundred or more years ago. Constitutional questions are usually analyzed using the language and concepts of the time in which the rule was first stated—thoughts and concepts based on philosophical and experiential developments evolved over centuries and based not only on judicial precedent, but also parochial considerations.

I believe that the result reached by the Court in this case is correct; I therefore concur. However, I believe that the opinion

is unduly concerned with federal constitutional law, gives insufficient recognition to the great difference between Vermont and federal constitutional prohibitions against unreasonable searches and seizures, and approaches the issue in a manner less efficient and less relevant than that which should be used. Instead, we should focus on the historical and philosophical background of the ideas expressed in the Vermont Constitution as it pertains to the question at issue here.

Defendant has invoked only Chapter 1, Article 11 of the Vermont Constitution, not its federal counterpart, the Fourth Amendment. "[O]ur constitution is not a mere reflection of the federal charter," *State v. Badger*, 141 Vt. 430, 448, 450 A.2d 336, 347 (1982), and I believe we should look at the Vermont Constitution without reference to its federal counterpart.

Our constitution differs both "historically and textually" from the United States Constitution. *Id.* To comprehend the difference between the Fourth Amendment use of "effects" and the Article 11 "possessions," we should examine other provisions of those respective documents. The Court does this to a certain extent in its introductory portion of Part II by referring to McCabe, *State Constitutions and the "Open Fields" Doctrine: A Historical-Definitional Analysis of the Scope of Protection Against Warrantless Searches of "Possessions,"* 13 Vt. L. Rev. 179 (1988). Although McCabe, after careful and scholarly analysis, concludes that the ordinary person of 1777 would have understood that "possessions" included land, the Court needlessly abandons this understanding of possessions as a ground for its decision. Rather, the Court's primary focus is on federal case law construing the Fourth Amendment. This approach shortchanges a significant difference affecting consideration of the extent of the protection afforded by Article 11. The Court does not examine the differences between the development of political and civil rights in Vermont as expressed in our constitution as contrasted with the corresponding developments in the first thirteen states or in the United States Constitution, which was enacted twelve years after Vermont's. When Article 11 is viewed in conjunction with the liberal provisions of other articles of the 1777 Vermont Constitution, there is solid ground for construing Article 11 broadly to hold that "possessions" intentionally included land as well as houses and papers within its protection.

Vermont, whose constitution is one of the early written constitutions, included two liberal provisions that had not appeared before in any constitution. The first of those provisions occurs at the beginning of its Declaration of Rights. Not only does it declare that all men are equally free and independent, having, among other things, the rights of "enjoying and defending life and liberty, acquiring, possessing and protecting property," etc.; it specifically prohibits slavery. Vt. Const. ch. 1, art. 1. In contrast to the liberal view of the Vermont constitutional framers are the provisions of the United States Constitution that left the institution of slavery in place, gave slaves no political rights, and treated slaves as three-fifths of freemen for purposes of representation. In a second provision, Vermont then acknowledged that all freemen should have the right to participate in government, to vote, and to hold office without any requirement that they own property to do so. Vt. Const. ch. I, art. 8. (Of course, this latter concept has continued to evolve; only early in this century have women gained the right to vote, and their economic equality has yet to be achieved.) The federal constitution originally contained no suffrage provision, thereby leaving to the states control of elections and requirements for voting, even for federal offices, and most states for many years made property ownership a prerequisite for voting and holding office. It took nearly one hundred years and a civil war for the United States to accomplish what Vermont did in its Constitution.

Other provisions in Vermont's Constitution show a similarly expansive approach to political rights. The original document was adopted on July 8, 1777, entitled "A Declaration of the rights of the Inhabitants of the State of Vermont." The nineteen sections of chapter I provide a unique and broad panoply of rights found in neither the constitutions of most of the first thirteen states, nor in the original United States Constitution until the separate adoption of the first ten amendments known as the Bill of Rights.

Further evidence of the libertarian focus of the Vermont Constitution is found in its preamble, which begins:

> Whereas, all government ought to be instituted and supported for the security and protection of the community as

such, and to enable the individuals who compose it to enjoy their natural rights . . . .

The preamble then recites the land claim disputes between New York and the inhabitants of Vermont, as the new state created by the document is for the first time called, for the purpose of making clear that the claims of New York, which that state had sought to enforce by invasions by law enforcement officers, were invalid and in violation of the rights of owners of land involved. Protection of citizens' rights to security in their land was a key motivating force in creating the Vermont Constitution.

The right expressed in Article 11—that invasion of a citizen's land by a law enforcement officer is prohibited—is at the very heart of the preservation of the liberty and freedom of human beings guaranteed by the Vermont Constitution. Although Article 11's protection is limited in some respects—a properly obtained warrant permits entry onto a citizen's land and only "unreasonable" searches and seizures are prohibited—this right remains a central force.

Because the security in property is central to the Vermont Constitution and for all the reasons stated in Part III of the Court's opinion, I agree that the reasonable expectation of privacy test in *Oliver* "simply fails to do justice to the values underlying Article 11." All of a citizen's land must be free from invasion by the government absent a warrant.

The Court goes on in Part IV to require landowners to take affirmative action to establish a reasonable expectation of privacy, e.g., by erecting "fences, barriers or 'no trespassing' signs [that] reasonably indicate that strangers are not welcome on the land." I cannot agree with this conclusion. Article 11 is not concerned with "strangers" unless they are law enforcement officers, i.e., the minions of the government, who were the reason for the concerns of the framers of the Vermont Constitution expressed in that article. Moreover, the prohibition in Article 11 is unequivocal: it gives the owner or possessor of the land an expectation of privacy with regard to any law enforcement officer. The landowner should not have to take any action to make that right effective. It is irrelevant that other persons may enter the land by trespass or by permission. If they do and report illegal activity on the land to law enforcement officers, and if

they are reliable people, probable cause for issuance of a warrant exists and law enforcement officers may enter after obtaining a warrant.

The Court thereafter states that "Vermont law allows persons to enter lands for certain purposes under certain conditions," cites the conditions, and concludes that, while those "provisions evidence the state's policy of providing the public with certain privileges and liberties not permitted under the common law," "[t]hey evidence no intent, however, to limit the right of landowners to pursue their affairs free from unregulated intrusion by officials." With that conclusion, I agree.

In Part V of the opinion, the Court rejects the per se rule in *Oliver* and explains at length why it is reluctant to use the phrase "reasonable expectation of privacy" and to accept the nuances of that phrase as explicated in the federal cases. It then concludes: "Our fundamental divergence from federal law, in the present case, lies not in the name given to the test but in the manner in which the test is understood and applied in the specific context of 'open fields,'" leaving the test without a name and relative to a doctrinal concept developed to explain an aberration in federal search and seizure law. To me that is not very helpful.

Although I do not agree with the first portion of Part V of the Court's opinion, I do agree with Part VI, that on the facts:

> the officers' walk over defendant's logging roads and through his woods violated his right to privacy under Article 11, and the evidence obtained thereby may not be used against him.

I also strongly agree with the statements:

> The rule announced here does not significantly hamper the police from investigating suspected criminal activity. It does require police to obtain a warrant, based upon probable cause, before they enter land . . . . The rule brings the practice of law enforcement into compliance with our fundamental law, which empowers the judiciary to guard the rights of the people through the warrant process.

Finally, while I share some of Justice Peck's concern about the problems of law enforcement officers, I believe that, if those problems result from our Constitution or laws, the way to over-

come them is to amend the Constitution or laws. While that procedure is time consuming—especially where the Constitution is to be amended—the purpose of the provisions for amending the Constitution is to prevent precipitate action relative to it. Perhaps even more important would be for law enforcement officers to fully respect constitutional rights. In too many instances over the last few decades there have been too many cases where they did not. Although they knew what was required, they unnecessarily cut corners. This case is an example.

**Peck, J.,** dissenting. I am sadly disappointed, and frustrated beyond comfort, by the decision of the majority in this case. Reviewing the opinion, I was visited by the eerie feeling that what I was reading was not an appellate judicial opinion at all, formulated after full and fair consideration of the arguments presented on behalf of both parties by an impartial and neutral body. Rather it impressed me as a brief for the defendant. Certainly it is, in my judgment, one of the most result-oriented opinions I have ever been exposed to. I am not prepared to countenance in silence the extreme and unwarranted judicial activism of which the opinion is an example. Accordingly, I dissent, and will outline my reasons below.

The flaws in the opinion are legion—for they are many—too many in fact to give them all the attention they deserve. But the case has languished, in this Court alone, for almost two years (it was argued during the March Term of 1989). I feel it would be unconscionable to delay it any further. Therefore, I have selected only the more egregious faults in the opinion for discussion in this dissent.

There are at least two key words in Article Eleven which are of fundamental importance to an honest resolution of this matter. One is "possessions" which appears expressly in the text of the article, the other is the word "unreasonable," which does not appear expressly but which "this Court has held . . . is as implicit in Article Eleven as it is express in the Fourth Amendment [to the United States Constitution]." *State v. Record,* 150 Vt. 84, 85, 548 A.2d 422, 423 (1988). As early as the middle of the last century, well over one hundred years ago, this Court said: "the construction of the eleventh article of our bill of rights is to secure *only* against *unreasonable* searches and seizures . . . ."

*Lincoln v. Smith*, 27 Vt. 328, 346 (1855) (emphasis added); see also *State v. Badger*, 141 Vt. 430, 454, 450 A.2d 336, 350 (1982) (approving *Lincoln*).

It is the treatment by the majority of these two words "unreasonable" (searches or seizures) and "possessions" that I will review at the outset. I will consider "possessions" first.

## I.

### The "Possessions" Enigma

Article Eleven of the Vermont Constitution protects the people (themselves), their houses, papers, and *possessions* against unreasonable search and seizure. On the other hand the Fourth Amendment to the United States Constitution protects persons, houses, papers, and *effects*.

The only difference in the wording of the two search and seizure provisions, the one using "possessions," the other, "effects," so bewilders the majority that the opinion devotes several pages to explaining why its research "sheds little light" on this discrepancy and does not help in resolving the issues which confront us here. Unable to find a meaning for "possessions," or reconcile the discrepancy, the majority resorts to the strangest of alternatives, saying, in effect, that since we are unable to give a meaning to the word "possessions," it has no meaning; therefore, the word does not exist, and there is no need to consider it at all, either in relation to the Fourth Amendment's "effects," or as a part of Article Eleven in its own right.

I suspect that this amputation of "possessions" is a calculated tactic rather than the result of interpretive incompetency. In my view, the word "possessions" in Article Eleven means "personalty," and the majority is well aware of it. Its refusal to acknowledge what is obvious, is, in reality, based on a failure to recognize that "possessions" is not only a key word in Eleven, which indeed it is, but may well be *the* key word in this inquiry.

Claiming, as I do, that "possessions" as used in Eleven refers to personalty, I concede, nevertheless, that possessions *can* mean *anything* possessed, including land. Its more specific meaning in a particular case, however, depends on the context in which it is used. Thus, in media reports and other writings

concerning the so-called Okies who fled from the dust bowl in the 1930's, they were not infrequently described as salvaging, and taking with them, as many of their "possessions" as they could cram into ramshackle cars and trucks. Used in such a context, there can be no question that "possessions" means, and can only mean "personalty"; certainly those writings had no relation to land.

As the majority notes, relying on its dictionary, the word "effects," like "possessions," may also apply to land. The opinion argues "effects" has been given a broader meaning, to include realty. The United States Supreme Court, however, has recognized, as the majority here is incapable of doing, that many words must be defined by the context of the use to which it is put, and has, accordingly, construed "effects," in its Fourth Amendment context, as referring to personalty.

Disregarding a word because it may have different meanings in different contexts constitutes an argument weak to the point of absurdity. If every word in the English language which lends itself to more than one meaning, depending on the context in which it is used, must be abandoned, we would seriously impair the versatility of our mother tongue, and probably of every other language as well.

The honest approach would have been a neutral analysis of Article Eleven and not merely shaping it to fit a desired result. But, of course, the majority could not bring itself to that degree of fairness and impartiality; to have done so would have defeated its exercise in result orientation.

The word "land," as such, does not appear expressly in Article Eleven, nor is it employed in the Fourth Amendment. "Land" has been incorporated into both constitutional provisions by judicial interpretation over a period of time and, in the case of Article Eleven, without relying on the word "possessions." The same is true of the word "effects" in the Fourth Amendment.

As I read these two constitutional provisions, the implicit inclusion of the word "lands" in both Article Eleven and the Fourth Amendment stems from the word "houses." Extending the application of these provisions to so much of the land as surrounds and serves the primary residential purposes of the *house*, that is the curtilage, is a logical and reasonable inter-

pretation. Open fields are simply not within the scope of Article Eleven or the Fourth Amendment.

It is not necessary, however much it may delight judicial activists, to find that a constitutional problem exists simply because it is claimed by one of the parties. Open fields, like all lands, have always been protected by common-law trespass actions and, more recently, by the criminal trespass statutes enacted by the Legislature. From reading the majority opinion, one receives the false impression that the *only* way an owner of open fields can protect him or herself against unwanted intrusion by the public is through a further expansion of the scope of Article Eleven. This is deliberately misleading. For all realistic and practical purposes, the *sole* beneficiary of today's decision is the owner of open fields who conducts criminal activity thereon in defiance of the law. In short, the majority has given birth to a right of privacy to commit crime. If our marijuana farmers have the good sense I think they have, they will soon be busy as little bees putting up no-trespassing signs, while laughing up their sleeves at the gullible naivete of the cooperative majority.

A final observation. The holding by the majority that no-trespassing signs and other devices appropriate to exclude the "public" from open fields serve to exclude police without a warrant as well is preposterous. It is like saying a police cruiser, in responding to an emergency call, may not exceed the speed limit because there are laws against speeding.

If we are to accept the majority's contention that the meaning of "possessions" cannot be determined, or, perhaps, at best, that the word is to be given the broad and general meaning which ignores context, the words "houses" and "papers" become unnecessary and confusing surplusage, since both words describe possessions in the broad sense.

The majority moves on to suggest that the framers of the Vermont Constitution acted in such haste that they really did not know what they were doing, and, I presume, simply tossed in words willy-nilly with no intent that they have any particular meaning; merely filling in blanks, as it were, with the first word that came to mind. This is an insult to those men. Moreover, it must follow that the Fourth Amendment (and indeed the original federal Bill of Rights in its entirety), which is so similar to

Article Eleven, was also slapped together hastily, and with no particular intent as to the meaning of the key words employed. But we know as a matter of history that it was not carelessly prepared but was the subject of careful consideration.

I reject any such predicate without reservation. I believe the framers of Article Eleven selected the key words advisedly and intended a meaning in each case. I suggest that interpreting "possessions" to mean "personalty" is a logical and reasonable construction. Not only does it give the word a valid meaning, which we must assume the framers intended it to have, but it serves to reconcile Article Eleven and the Fourth Amendment.

But the majority is not indifferent to the "personalty" interpretation—I can understand why. The interpretation is attacked directly, even though the attack itself is vague and badly needs an explanation. At one point, the opinion reads: "If we confined the meaning of 'possessions' to personalty for Article 11 purposes, we would necessarily run counter to the federal development of even the narrower word 'effects' found in the Fourth Amendment."

What "federal development" is it that suddenly appears before us? I am not aware of any. It is as illusory as Macbeth's vision, "Is this a dagger which I see before me . . . ?" The attempted explanation only adds to the mystery. The opinion continues: "In numerous cases, the United States Supreme Court has extended protection beyond the plain meaning of the places and things enumerated in the Fourth Amendment." I ask, using the vernacular, so what, exactly? What has that to do with the price of eggs? Or in plainer language, what has it to do with some mythic "development" of the word "effects?"

The cases cited, supposedly as examples (of something), by way of clarification, only intensify the darkness; most of them have no relation at all to "effects" or "personalty." Thus, a conversation in a phone booth is not an "effect." Therefore, the claim that this has something to do with a federal development relating to "effects" is nonsense; the same is true of "commercial premises" and "hotel rooms," neither are "effects."

I am just guessing, but it seems probable that what the majority is doing is making a quantum leap from the specific, i.e., "effects" to the general, lumping together all the specifics of the Fourth Amendment, "persons, houses, papers or effects," and

equating any "general" expansion of the Fourth Amendment to the specific "effects." I am afraid that the majority's training in elementary logic, if any, failed to penetrate or make a lasting impression. The majority's reasoning is a syllogistic blunder and a non sequitur.

Further, no one has said that the meaning of "possessions" should be "confined" to personalty. On the contrary, the word, like any other word in American constitutions, under rules applicable to the construction of such documents, as distinguished from statutory construction, is subject to expansion over time, in my judgment, however, within a range, reasonably related to the key words. Thus, if the only key word in Eleven was "papers," it would be an egregious abuse of power to enlarge the scope of that word to include unrelated and unnamed categories.

I believe that key words in constitutions are put there advisedly and with a definite purpose in mind, that they serve, not necessarily a literal, plain-meaning function, but as guidelines, limited only by their reasonably related scope. Thus, I am satisfied that, for example, "possessions" and "effects," considered as personalty, could reasonably and acceptably be interpreted to include fixtures. Given the uncanny ingenuity of the judiciary, I expect other possibilities could be unearthed as well. Nevertheless "personalty" should stand, within the meaning of its generality, as a guideline to the scope of the interest protected or the right granted.

The word "possessions" in Article Eleven, like "effects" in the Fourth Amendment, should be interpreted to mean "personalty," and should not be deleted as meaningless.

## II.

### Unreasonable Searches

There is no question, I think, that if the warrantless search involved here was reasonable there was no violation of defendant's Fourth Amendment rights.

The reasonableness of each search or seizure depends on the factual background of the particular case. The facts and circumstances surrounding the matter before us should be reviewed carefully and fairly.

Having in mind the no trespassing signs posted by the defendant, the majority engages in a grossly unfair example of police-bashing. The opinion reads: "By no stretch of the imagination could the officers reasonably conclude, under the standards we have set out here, that their 'walk-on' search was permissible." If I were a member of a police organization, I would deeply resent that comment; as it is, I am putting my reaction mildly in saying I am disturbed by it.

The police are not psychic. At the time they entered the open fields portion of defendant's property, they had no way of knowing or of anticipating that this Court would follow, sheep-like, the decision of one of the most activist-oriented among the state courts, or that we would reject a contrary decision by the high court of a state which borders us and is far more similar to us in size and other characteristics than the former.

It is true that we have never before considered a case involving the precise situation here, that is, the warrantless search of open fields, distinguished from the general rule in such cases, *only* by the fact that defendant had erected no trespassing signs. The *general* rule, almost, if not universally, recognized, being that such searches do not violate the Fourth Amendment to the United States Constitution, and in this state, do not violate Article Eleven of the Vermont Constitution. *State v. Chester*, 156 Vt. 638, 587 A.2d 1008 (1991) (mem.).

The extent of the knowledge with which the police could be charged at the time they entered defendant's land is, first, the general rule that a warrant is not required to inspect open fields, and second, that the land which they did inspect was open fields. They had no reason to suppose or anticipate that an exception to the rule was about to be foisted on them by a wildly activist court. For that matter, and again at that time, because the land on which defendant chose to defy the law (successfully—given after-the-fact cooperation by the majority) was open fields, he had no reasonable expectation of privacy. *State v. Byrne*, 149 Vt. 224, 227–28, 542 A.2d 276, 278–79 (1988) (an individual may not legitimately demand privacy for activities conducted out of doors except in the area immediately surrounding the home).

I have conceded that this is a case of first impression here. Nevertheless, our prior cases, including those in which we have

held that Article Eleven and the Fourth Amendment were similar, see *State v. Record*, 150 Vt. at 86, 548 A.2d at 424, mislead the police into believing that since police conduct, not unlike their contemplated entry, did not violate the Fourth Amendment, see *Oliver v. United States*, 466 U.S. 170, 181 (1984); *State v. Byrne*, 149 Vt. at 227, 542 A.2d at 278, their entry was proper because it involved open fields.

Finally, I would remind the majority, as it sheds its tears for the defendant, that the entry was not arbitrary. It was not an afternoon of sport for the police, on the off-chance they might just happen to stumble on marijuana or some other contraband, in much the same spirit that we hunt deer and other game. The entry was undertaken in reliance on a "tip"; with every reason to believe the search was legitimate, and it was done in good faith.

Under these circumstances, in *this* case, I think a neutral fairness (which I gather cannot be expected of the majority when it sees an opportunity to enhance its prestige among the law reviews and other commentators on matters legal by expanding the "rights" of even obviously guilty criminals) should require a conclusion that the police acted reasonably and in good faith.

The colloquial bottom line must be that if the owner of open fields will but erect no trespassing signs there can be no *possible* combination of facts and circumstances which might justify a warrantless search; such a search is unreasonable per se, and the State cannot be permitted to present evidence which, in a particular case, would support a finding that the entry and search was reasonable. But the reasonableness factor is a *constitutional* concern applicable to *all* cases without distinction, and should be subject to a determination on a case-by-case basis and not resolved arbitrarily by a per se rule which eliminates reasonableness from Article Eleven.

## III.

### The Balancing Test

There are at least three examples of inexcusably grim irony which emerge from today's decision. First, while almost rudely condemning the United States Supreme Court for adopting a

per se rule applicable to cases similar to this one, the majority, doing its pot-and-kettle act, promptly executes a volte-face and promulgates its own per se rule. As discussed above, notwithstanding the legitimacy of warrantless searches supposedly depends on reasonableness, and therefore to be determined on a case-by-case basis, the majority throws that test into the ash can, holding that if an owner erects no trespassing signs or some other indication that he seeks to keep out the public, an entry by police into open fields is per se unreasonable.

Second, while the police of our neighbor and sister state of New Hampshire are not subjected to such a limitation by its courts, the liberal-activist Supreme Court of this state, just across the river, has placed still another impediment in the way of successful criminal investigation by the Vermont police. The irony becomes all the more apparent with the statement in the opinion: "The rule announced here does not significantly hamper the police from investigating suspected criminal activity." That impresses me as complacent and pietistic; it *significantly* hampers the police. Not only do they have to chase around looking for a judge to issue a warrant before searching the same type of land which, except for no trespassing signs, they would not need a warrant to search, but different judges react differently in deciding whether they will issue a warrant at all. The majority has certainly added still another major obstacle in the way of police efforts in carrying out their job of protecting the safety of all of us.

Third is still another statement in the opinion which says, in effect, that in promulgating its per se rule, the majority recognizes that it will inevitably *protect* some criminal activity, but that this is nevertheless necessary "in securing the rights of all of us." That borders on the hypocritical. If the majority had the least concern for "the rights of all of us," it would not have turned its back on Article One of the Vermont Constitution. Guaranteeing the safety of the inhabitants of Vermont, as individuals, is the very *purpose* of Article One. But rather than give it due consideration, the article is subjected to a cover-up of silence.

This is perhaps not surprising. The opinion is result-oriented at best. A fair consideration of Article One would pose a threat to the majority's position. Nevertheless, such deliberate avoid-

ance denigrates the integrity of appellate review; it permits a result which has been determined by consideration of only half the issues, or less. It is indeed result-oriented. This is underscored by the fact that Article One was brought to the attention of the majority and rejected without any reason being given.

When two articles of a constitution may call for different results if each is considered independently of the other, the courts should first attempt to reconcile the two if possible. If not, the court must, or certainly should, through intelligent and careful analysis, determine which one of the two is to be accorded priority.

If the majority is prepared to follow, sheep-like, a decision of one of the more liberal and activist-oriented of our sister-state courts, and reject those of states, one of them being an immediate neighbor, dismissing the latter arbitrarily as "bad law," one would expect it has at least some responsibility to consider the *recent* precedent to be found in our own decisions which are analogous to the instant case.

*State v. Record, supra,** is a case which is similar to the matter now before us to the extent of concerns involving Articles Eleven and One. We did not duck the issue in that case, but faced it squarely; at one point, we stated:

> The language of Article Eleven seems to prohibit unequivocally warrantless searches and seizures; however, *Article One* sets forth the principle that *all persons* have the right to enjoy "certain natural, inherent, and unalienable *rights*, amongst which [is] . . . safety . . . . We recognize that in order to preserve Article One interests . . . this Court has *balanced and limited* the Article Eleven interest . . . where *the public welfare* is at stake."

---

\* Strictly speaking, *Record* involves seizures primarily, rather than searches as in this case. Nevertheless, under both the Fourth Amendment to the United States Constitution, and Article 11 of the Vermont Constitution, search and seizure are treated alike. See *Record,* 150 Vt. at 85, 548 A.2d at 423 ("'[T]he construction of the eleventh article of [the Vermont Constitution] is to secure *only* against unreasonable searches . . . .' Article Eleven *does not mandate an absolute prohibition* against searches and seizures undertaken without a proper warrant." (quoting *Lincoln v. Smith,* 27 Vt. at 346 (emphasis added))).

150 Vt. at 86–87, 548 A.2d at 424 (emphasis added; citations omitted). In following the principle promulgated by this statement, the Court's opinion in *Record* mentions the Article One element of *safety* at several points, and concludes that where a warrantless search or seizure is an issue in a case involving both articles, the court should apply a *balancing test,* that is,

> by weighing the public interest . . . against the degree of intrusion into personal privacy . . . . The reasonableness . . . depends "on a *balance* between the public interest" [and] . . . the degree [of intrusion] upon an individual's legitimate and reasonable expectation of privacy . . . .
>
> . . . We are, after all, *balancing* an important private right . . . against the safety and welfare of the people . . . .

*Id.* at 87–88, 548 A.2d at 424–25 (emphasis added).

The lesson to be learned from *Record* contains several parts: (1) "Article Eleven does *not* mandate an absolute prohibition against searches . . . undertaken without a proper warrant." *Id.* at 85, 548 A.2d at 423 (emphasis added). On the contrary, it has long been recognized that there are exceptions to the prohibition; (2) since Article Eleven does not impose an absolute prohibition against warrantless searches, an analysis of its range *must* include the effect of the other *constitutional* provisions which may impinge on the scope of Eleven; (3) Article One secures to *all inhabitants* of Vermont, "certain *natural, inherent, and unalienable rights,* amongst which [is the *right* to enjoy personal] safety." *Id.* at 86–87, 548 A.2d at 424 (quoting Vt. Const. ch. I, art. 1); (4) "In the past, this Court has *balanced and limited* the Article Eleven interest . . . where the public welfare is at stake." *Id.* at 87, 548 A.2d at 424 (emphasis added); (5) it cannot be doubted that, under *Record,* the *safety* guaranteed by Article One is included and implicit in the phrase "public welfare"; and (6) nor can it be doubted fairly that (under *Record*) the right to be free from warrantless searches, under Article Eleven, may, in an appropriate case, be limited by the right of all inhabitants to enjoy the safety secured by Article One.

In the light of the above discussion, I conclude and submit that, when there exists in a given case both an Article Eleven issue, and a public safety issue under Article One, and the two

are not, or may not, be consistent, one with the other, this Court must resolve the question of priority through the application of a balancing test as mandated by *Record*. The failure of the majority to comply with its obligation, particularly where there are two issues, *both* of which involve different guarantees by separate provisions of the Vermont Constitution, is impossible to comprehend and completely unacceptable.

The majority not only fails to apply the balancing test, it ignores Article One completely. The entire opinion seems based on the premise that Article Eleven is the only constitutional provision involved, and the result requires no more than an analysis of that article, for all the world as though Article One did not exist. Albeit the majority opinion is "bad law," even in its attempt to analyze Article Eleven standing alone, it is made all the more so by deliberately ignoring Article One.

## IV.

### Summary and Conclusions

In a recent case, *State v. Jewett*, 146 Vt. 221, 500 A.2d 233 (1985), we said this:

> The development of state constitutional jurisprudence will call for the exercise of great judicial responsibility . . . . It would be a serious mistake for this Court to use its state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. *Our decisions must be principled, not result-oriented.* Justice Pollock of the New Jersey Supreme Court expressed his concern this way: "[s]tate courts should not look to their constitutions only when they wish to reach a result different from the United States Supreme Court. That practice runs the risk of criticism as being more pragmatic than principled."

*Id.* at 224–25, 500 A.2d at 235–36 (emphasis added; footnote omitted).

It is difficult to imagine a more willful and calculated violation of this caution urging judicial restraint, and against unprincipled activism and result orientation, than is represented by today's decision and the rationale which purports to justify it. The majority's hidden agenda is to evade the impact of decisions of the United States Supreme Court.

Very conveniently in aid of its objective, the majority commences its horror story by arguing that the word "possessions" is meaningless and, therefore, is not considered at all. This is bad enough certainly, when the meaning of this so-called mysterious word is considered in the context in which it is used. But what follows exacerbates the fault. In effect, the majority holds that in the process of constitutional interpretation, none of the key words have meaning. Rather all we are to look for is some vague, nebulous, and fatally subjective concept called, I gather, "underlying values."

I do not quarrel with the concept of values, per se, in constitutional construction. I do say, however, that they do not exist in a sort of subjective, wishing-well vacuum, completely *dehors* the text of the provision being considered. I believe all key words in a constitutional provision must be *presumed* to have been used advisedly, intelligently, and as guidelines to intent.

Again in *Jewett*, we quoted Justice Joseph Story:

> "It is obvious, that there can be no security to the people in any constitution of government if they are not to judge of it by the fair meaning of the words of the text."

*Id.* at 226, 500 A.2d at 237.

Referring to the importance of examining the context in which words are used, Justice Oliver Wendell Holmes made several comments which are often quoted because of their wisdom. Among them, the two following:

> A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.

*Towne v. Eisner*, 245 U.S. 418, 425 (1918).

> A word generally has several meanings, even in the dictionary. You have to consider the sentence in which it stands to decide which of those meanings it bears in the particular case, and very likely will see that it there has a shade of significance more refined than any given in the word-book.

Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 417 (1899).

If the key words employed in constitutional provisions are to have no significance or meaning, as guidelines or otherwise, in

determining the values which underlie the provision, the statement I made in an earlier dissent bears repeating.

> If . . . constitutions, state and federal, mean whatever the highest courts having jurisdiction say they mean, and that power of interpretation is not exercised with restraint, we may as well adopt "Mary Had a Little Lamb" for constitutional purposes.

*State v. Brunelle*, 148 Vt. 347, 365, 534 A.2d 198, 210 (1987) (Peck, J., dissenting).

I conclude that the majority had an obligation to give significance to the key words in Article Eleven. Instead, it has ignored, not only "possessions," the meaning of which is unmistakably clear when considered in context, but the others as well. Having committed this sin against judicial restraint, compounding it by deliberately turning its back on Article One and the balancing test, the majority adopts Mary and her Little Lamb as Article Eleven, thus lifting itself by its own bootstraps into an ideal position to prepare the subjective, result-oriented opinion and decision which follows.

The out-of-context quotation from *Katz v. United States*, 389 U.S. 347, 353 (1967), that constitutional search-and-seizure provisions "protect people—and not simply 'areas,'" without more, permits the majority, like Napoleon, to crown itself, with the glittering halo of being concerned only with the rights of the people ("all of us"). The patter is smooth and seductive, perfumed with important-sounding legalese, and sprinkled with an appropriate number of citations, all in the manner approved for judicial opinions. But the opinion betrays its true priority; it does not concern itself with *all* the people, only with those who are fortunate enough to own sizeable real estate interests, who have no practical need for protection since it already exists in the civil and criminal law. The only class which, as a pragmatic fact realizes protection it does not already have, is, to state it bluntly, the criminals.

Moreover, if the majority had the slightest concern for "all of us," it would have given priority, or at least equal consideration, to the right, supposedly guaranteed to all of us, to live in safety, free from violence, the addictions, and the adverse social consequences of the drug traffic, which constitutes one of the great-

est crimes against humanity since the days of the Third Reich in Nazi Germany under Adolf Hitler.

The refusal of the majority to concern itself with, or to give any consideration to, the most significant of the key words in Article Eleven, "possessions," and indeed to treat all the key words as meaningless, is irresponsible. It permits the majority to abandon restraint, and adopt a purely subjective, wish-fulfillment standard of constitutional interpretation, based on nothing but the extremes of judicial activism which is so clearly revealed by the decision. The virus which infects so many courts in criminal cases, and leaves them with tunnel vision, seeing only the criminal as having any rights, continues to ravage this Court. *Jewett* is forgotten; *Record* is snubbed and buried.

The medical profession has, in recent years, stressed preventative medicine equally with the curative. The courts should take heed of this in criminal matters and develop their potential for preventive law. One step might well be to serve notice that, in those cases where guilt, per se, is a fact, as distinguished from an evidentiary question, technicalities will be enforced, but with reluctance and with concern for the people who will be the future victims. As it is now, too often, judicial opinions with the authoring pens dipped in the crocodile tears of activist judges, constitute "A Criminal's Vade Mecum, or How to Commit Crime and Get Away With It."

Today's decision stands as evidence that this Court is preoccupied, particularly in criminal cases, with the favorite diversion of too many state appellate courts, the sport of hunting for a constitutional baby behind every bush, waiting for the courts to come along, arm in arm with the whining wrongdoers who have been detected *in flagrante delicto*, and find them. But such undiscovered infants are no longer that numerous; therefore the test of a court's expertise in the sport becomes its ability to *create* new ones out of legal words and phrases and cliches, and emerge crying triumphantly like Frankenstein, "Its alive! Its alive!" Behold "the justice[s] . . . with eyes severe . . . Full of wise saws and modern instances." As You Like It, Act 2, Sc. 7: "Go and sin some more. Try not to get caught the next time, but if you do remember we'll always be here. We'll put on our thinking caps and do what we can for you; that's what we are here for.

There may well be another bush out there which we over-looked." What is left to the state courts by which they may achieve prestige and recognition in the trade as masters of the constitution in criminal cases, if they cannot play their games of expansion by clever interpretation, although, almost inevitably, as here, the expansions impede the investigation of crimes, the self-serving disclaimers by the majority to the contrary not-withstanding, and lead to still further shrinking of the right to safety supposedly guaranteed to "all of us" by Article One. This decision is analogous to judicial legislation by statutory con-struction, but it is more egregious; it is judicial *amendment* of a constitution by interpretation.

The decision and opinion may be glib and delight the eyes of the "groundlings," but, analyzed, it is shadow without sub-stance; too many factors are simply ignored. Whatever may be said for its "form," it remains a case of "the singer not the song" who merits the laurels. It is like a speaker who can move his listeners by his eloquence and obscure, but important sounding, words alone, without really saying anything.

My theme of being result-oriented runs through this dissent from the result and the rationale. It may suffer from repetition, but I feel it strongly, and urge the Court to greater restraint hereafter, and to have greater concern for the victims-to-be of future crimes by adopting a policy of preventive law. "All of us" are entitled to the constitutional guarantees of safety, and to no less. At least engage in a *fair* balancing of constitutional rights.

The majority has chosen the possible prestige with which it may be honored by law reviews and other constitutional activ-ists among the courts, and legal writers, to a recognition of the rights of the individual inhabitants of the State of Vermont, which would probably pass relatively unnoticed because it would not change the law as it has long existed. But all that glitters is not gold; in this case it is dross, although it may take years to discover the fools gold that lies just below the surface. Today's decision demonstrates that English writer Thomas Babington Macaulay was, perhaps, a better prophet than he re-alized when he wrote to an American friend, "Your constitution is all sail and no anchor."